STATE of Iowa, Appellee,

v.

Steve Lee DAVIDSON, Appellant.

No. 68404.

Supreme Court of Iowa.

Nov. 23, 1983.

Charles L. Harrington, Appellate Defender and Patrick R. Grady, Asst. Appellate Defender, for appellant.

Thomas J. Miller, Atty. Gen., Sherie Barnett, Michael Jordan, Asst. Attys. Gen., and James C. Bauch, Black Hawk County Atty., for appellee.

Considered by UHLENHOPP, P.J., and HARRIS, McCORMICK, LARSON and SCHULTZ, JJ.

HARRIS, Justice.

Defendant was convicted after a bench trial of first degree murder for the death of his grandmother. His two assignments of error stem from his claimed lack of mental competence. Because of his mental condition he asserts statements he gave the police soon after the incident were involuntary and inadmissible. He also argues he was not competent to stand trial. We affirm.

On February 23, 1981, defendant went to the Cedar Falls police station and asked to speak with someone privately. Police officer Bolin responded and walked with defendant to a conference room where defendant told Bolin he had committed a "serious crime" and "wanted to kill everybody." Bolin immediately attempted to give defendant his *Miranda* warnings but defendant interrupted, stating in what Bolin described as a "direct and deliberate" voice that he had beaten his grandmother.

Defendant was taken to another officer, Sink, who advised him of his *Miranda* rights. In response to Sink's inquiries defendant said he understood his rights and had no question about them. Defendant was then taken to the detective's office where Sink laid a standard waiver of rights form in front of him and read it to him. In response to Sink's inquiries defendant again stated he understood his rights and had no questions. Officer Sink asked defendant to sign the waiver if he was willing to talk about the assault. Defendant signed.

Sink then asked defendant questions and typed his responses. Defendant said he had beaten, stabbed, and choked his grandmother, and then drove his car to the police station. He said that his offense was wrong. He also told Sink he had a history of mental treatments for his aggressive tendencies.

Defendant read through the statement and said it was accurate. Sink then read the statement to defendant a few lines at a time, pausing to ask if each portion was accurate. Defendant then signed the statement.

The officers testified that during the time defendant was given his *Miranda* warnings, signed the waiver, and gave his statement he was serious, calm, and answered all questions matter of factly. They said his facial expressions changed very little. The officers thought defendant was coherent and completely aware of where he was, with whom he was speaking, and of what he was doing. He was not hand-cuffed and was allowed to sit and smoke. The officers never made any threats or promises to induce his waiver or statement.

Defendant's grandmother was found in her kitchen, dead of multiple stab wounds.

I. Defendant moved to suppress his confession on the ground that his waiver and statements were involuntary because of his mental illness. The trial court's overruling of this motion and subsequent admission of defendant's statements are the subject of defendant's first assignment of error.

■■ We review the evidence *de novo* and make an independent evaluation under the totality of circumstances to determine whether the waiver and confession were voluntary. *State v. Hahn,* 259 N.W.2d 753, 758 (Iowa 1977). The burden of proof is on the State to prove by a preponderance of the evidence that defendant's waiver, *Fryer v. State,* 325 N.W.2d 400, 409 (Iowa 1982), and confession, *State v. Holderness,* 301 N.W.2d 733, 739 (Iowa 1981), were made knowingly, voluntarily, and intelligently.

We often have been presented with a claim that an admission or waiver was involuntary because the person making the statement was mentally subnormal or disordered. Cases where the waiver or admission was found involuntary include *In the Interest of Thompson,* 241 N.W.2d 2, 7 (Iowa 1976) (defendant age seventeen, virtually abandoned at early age, spent four previous years in mental health center, had I.Q. of seventy-one, very low practical judgment, fourth grade reading level, was frightened, insecure, frustrated, exhibited

passive-agressive behavior, significant signs of brain damage, and borderline mental retardation; also deprived of sleep and consultation with guardian, custodian, adult friend or lawyer); *State v. Cullison,* 227 N.W.2d 121, 128–29 (Iowa 1975) (defendant subjected to physically and psychologically intensive interrogation and suffered " 'probable psychological reaction to combination of drugs and situation' "). *See also* Annot., 8 A.L.R. 4th 16 (1981).

In a number of cases we have found a defendant's waiver or admission voluntary even though the defendant was mentally subnormal or disordered. *See State v. Brown,* 341 N.W.2d 10 (Iowa 1983) (borderline mentally retarded defendant; also, defendant knew he was free to leave, was carefully advised of his constitutional rights, demonstrated his understanding of police proceedings, and was questioned intermittently for two and one-half hours by only one officer during normal waking hours in familiar part of police station); *State v. Cook,* 330 N.W.2d 306, 308 (Iowa 1983) (defendant age twenty-one, was neglected and physically abused as child, had ten years of education, spent some of those years in school for learning disabled, received mostly zeroes and F's, was periodically under psychiatric care, was juvenile offender, sometimes lived in foster homes, had severe alcohol and drug problem, low-average intelligence, and suffered from " 'severe passive-aggressive personality disorder' "; also, defendant was aware of police operations and juvenile and criminal affairs); *Fryer,* 325 N.W.2d at 409 (defendant functioned at " 'dull-normal range,' " had I.Q. of eighty-seven, was not illiterate, operated motor vehicle, and performed complicated mechanical tasks; also, defendant was given *Miranda* rights many times and in many ways); *Holderness,* 301 N.W.2d at 739 (defendant was "suggestible" because of low intelligence and read with difficulty, but was not incapable of understanding what was said or read to him, and owned and operated an automobile; also, officers reviewed statement with defendant three times before he signed it); *State v. Munro,* 295 N.W.2d 437, 443 (1980) (police used cer-

tain interrogation techniques based on psychological profile of defendant who had I.Q. of 130, close relationship with mother, alcohol problems, was suicidal, loner, and paranoid schizophrenic); *Hahn,* 259 N.W.2d at 758 (psychiatric testimony regarding defendant's long history of mental illness and her inability to appreciate or understand *Miranda* warnings; also, during interrogation defendant demonstrated ability to listen and comprehend questions, clearly and accurately related details, and expressly stated she understood *Miranda* warnings); *State v. Gilmore,* 259 N.W.2d 846, 859 (Iowa 1977) (psychiatric testimony that defendant had third grade reading level and could not understand waiver of rights statement whether read to him or by him; no showing of defendant's I.Q., that his poor reading was linked to subnormal intelligence, or that he was incapable of replying he could not understand waiver statement read by him); *State v. Snethen,* 245 N.W.2d 308, 315 (Iowa 1976) (defendant had history of serious head injuries, emotional disturbance and drug abuse, was nervous and excited during admission); *State v. Conner,* 241 N.W.2d 447, 453–54 (Iowa 1976) (defendant had I.Q. of seventy-two, bordered on retardation, educated to sixth grade, could not read or write, had extreme difficulty in understanding abstract concepts, but could distinguish numbers, add, subtract, and make change, was steadily employed for seven years, supported a wife and six children, owned an automobile and was licensed to drive; also, defendant had prior experience with police, previously employed a lawyer, was street-wise, and officers testified *Miranda* rights were carefully explained and defendant acknowledged understanding of those rights); *State v. Winfrey,* 221 N.W.2d 269, 271–73 (Iowa 1974) (defendant age seventeen, had I.Q. of eighty-five to ninety, was in low-average range of intelligence, had mental age of fourteen to fifteen, ten years of school in special classes for slow learners, and had spent considerable time in Eldora and jail; psychiatric testimony that defendant was capable of understanding statement of rights read to

him, depending on how statement was presented; also, officers clearly explained *Miranda* rights and defendant expressly rejected officer's suggestion his parents or attorney should be present); *State v. Fetters*, 202 N.W.2d 84, 89–90 (Iowa 1972) (defendant age twenty-four, had I.Q. of sixty-seven, low reading level, had been in special education, had completed sixth or seventh grade, had driver's license, operated automobile, was employed, and supported a wife and child; also, defendant was advised of his *Miranda* rights at least three times). *See also* Annot., 8 A.L.R. 4th 16 (1981).

■ As these cases illustrate, mental subnormality does not itself deprive a waiver or confession of voluntariness. On our *de novo* review we agree with the trial court's rejection of the view of Dr. Stern, a psychologist who testified for the defendant, and subscribe to the view of the two officers who took the statements and observed defendant's waiver. They believed defendant to be fully competent to waive his rights and give the statement. Dr. Stern painted a disturbing picture of defendant's condition at the time he evaluated him, including delusions and what appeared to him to be a lack of instinct to protect himself because of a compulsion to boast about the killing. But this evaluation took place three months after the statements were given.

■ Defendant's comportment and demeanor when giving the statements, according to the officers, differed greatly from Dr. Stern's description of defendant's symptoms. Dr. Stern could only guess that the symptoms he observed at the time of the examination were actually present three months earlier. We believe the evidence shows that the behavior of defendant at the police station does not square with Dr. Stern's description of defendant's symptoms. Rather than exhibiting any boastful attitude, defendant wished to speak in private, was calm and serious, and did not change his expression or conduct. He even acknowledged his actions were blameworthy. Rather than expressing delusions about the killing, defendant was coherent,

gave an accurate and detailed account of the day's events, knew the killing was wrong, expected to be arrested, and apparently decided to surrender rather than to await arrest.

We think Davidson's condition at the time he made his waiver and confession did not render them involuntary. Defendant's first assignment is without merit.

■ II. Defendant also contends that the trial court erred in finding him competent to stand trial. To be competent to stand trial, a defendant must be able to appreciate the charges, understand the proceedings, and effectively assist the defense. *State v. Lyon*, 293 N.W.2d 8, 9 (Iowa 1980).

■ Our scope of review on this question was explained in *State v. Jackson*, 305 N.W.2d 420, 425 (Iowa 1981), *State v. Pedersen*, 309 N.W.2d 490, 495–96 (Iowa 1981), and *State v. Aswegan*, 331 N.W.2d 93, 95 (Iowa 1983). Language in *Jackson* is cited by the State out of context. There was no due process challenge to the competency hearing in *Jackson*. The case does not stand for the proposition that our review of competency hearings is always on error. When a due process question is raised our review is *de novo*. *See Pedersen*, 309 N.W.2d at 495–96.

From the record we are not certain that defendant's pre-trial competency challenge was on the basis of due process. Selecting the scope of review will not, however, affect the result here because the assignment fails under either review. Without suggesting we must, we choose to assume the due process dimensions of the challenge were sufficiently raised as a part of the competency hearing. Hence, we proceed with a *de novo* review.

There was a conflict of testimony at Davidson's competency hearing. Dr. Stern examined Davidson five months before testifying and concluded Davidson would feel his attorney was out to do him harm if he pursued a diminished capacity defense. At that time Davidson wanted to plead guilty. Another psychiatrist, Dr. Hastings, also examined Davidson five months before the

hearing and testified that defendant's illness would prevent him from cooperating with his attorney. He concluded Davidson did not have the capacity to understand the "nuances of the courtroom" and might distort testimony and view his counsel as his enemy. On the other hand, Dr. Taylor, who testified for the State, examined defendant three months prior to the hearing and spoke briefly with defendant on the day of the hearing. He testified defendant's illness would not prevent him from understanding courtroom procedures or comprehending witnesses' testimony. Dr. Taylor believed Davidson was ready to follow his counsel's advice despite his opposition to an insanity plea and despite his extreme discomfort with persons testifying he was mentally ill.

On our *de novo* review we reach the same conclusion as the trial court. We find Davidson was able to appreciate the charges, understand the proceedings, and effectively assist the defense.

As neither of defendant's assignments have merit, we affirm the judgment of the trial court.

AFFIRMED.