**STATE of Iowa, Appellee,**

v.

**Joseph PHAMS, Appellant.**

No. 68561.

Supreme Court of Iowa.

Dec. 21, 1983.

Charles L. Harrington, Appellate Defender, and Linda Del Gallo, Asst. Appellate Defender, Des Moines, for appellant.

Thomas J. Miller, Atty. Gen., Steven M. Foritano, Asst. Atty. Gen., and David H. Correll, Black Hawk County Atty., for appellee.

HARRIS, Justice.

Defendant appeals his convictions of first degree murder of two Waterloo policemen. He assigns two errors: (1) there was insufficient evidence to support submitting certain jury instructions; and (2) the trial court should have suppressed defendant's inculpatory testimony, given at the separate trial of an accomplice. We affirm the trial court.

Shortly before midnight on July 12, 1981, Waterloo police officers Michael Hoing and Wayne Rice, in response to a complaint about loud music, stopped at the home of defendant Joseph Phams. A number of people were on the front porch of the house listening to music and drinking beer. Defendant was apparently inside the house lying on a couch in the living room.

After the music was turned off, the officers left the front yard area and returned to their squad car. Angered by the police intrusion, James Taylor, Thomas Ketchens, and Phams' brothers, Howard and Johnny,

began yelling and cursing at the officers. Both officers returned to where Johnny Phams was seated on the front porch steps and placed him under arrest for disturbing the peace. Johnny Phams protested the arrest and began struggling with officer Hoing. Defendant then burst through the front door, knocked officer Rice to the ground, and began struggling with him. Sometime during the struggle defendant got up and began hitting Rice on the head with a chair.

James Taylor, who had been standing near a car by the porch, ran to where officer Rice and defendant were struggling on the ground. Taylor struck Rice several times with his fist and, after two or three attempts, removed Rice's gun from its holster. While Taylor was attempting to remove the gun, Rice was struggling and wiggling his hips, but apparently defendant had him pinned. When Taylor got possession of the gun he yelled "move." Defendant rolled off Rice and Taylor fired two fatal shots into Rice's chest. Taylor then ran to where officer Hoing was still struggling with Johnny Phams, and fatally shot that officer.

Defendant was arrested and given the *Miranda* warnings shortly after the shooting. He said he understood his rights and requested an attorney. As he was taken past the two slain officers defendant looked at them and smiled. The officer who transported Phams to the police station testified:

> When I first entered my vehicle he [defendant] was sitting in the right rear of the patrol car. He then looked at me, spit at the plexiglass and stated "I am glad the motherfucking pigs are dead." He then said "I am glad the motherfucking honky pigs are dead" and spit one more time.

At the station defendant continued to smile and laugh about the events of that evening. He kept repeating statements to the effect that, because he did not pull the trigger, the police could not do anything to him, and "it ain't no big deal."

Prior to defendant's trial, Taylor was tried for the shooting of the officers.[1] Defendant, who was then charged with involuntary manslaughter, was subpoenaed to testify in Taylor's defense. Phams' appointed attorney filed a petition for a writ of habeas corpus which stated defendant would exercise his fifth amendment right against self-incrimination if questioned about the shooting. But defendant rejected the services of this attorney, persisted in testifying, and later rejected the services of other attorneys.

On the day defendant was taken to the Taylor trial one of these attorneys specifically told him that he "had the ability to stop his even being transported" and advised him not to go. Nevertheless defendant told the attorney he wanted to testify and rejected his services.

By his own choice, then, defendant was not represented by an attorney during the Taylor trial. Immediately prior to his testimony there, defendant was fully informed of his rights by the presiding judge. Defendant stated he understood his rights and wanted to testify. The judge again reminded defendant during the State's cross-examination that he was not required to answer any questions.

Defendant admitted at the Taylor trial that he had hit officer Rice on the head with a chair. He also testified of matters that are now said to have been delusions: that an actor disguised as Taylor shot the officers; that Taylor was not there; and that the officers were actors shot while playing a game with people who had surrounded his house in order to kill Phams.

Defendant was subsequently charged with two counts of first degree murder. Prior to and during his trial defendant sought to suppress his Taylor trial testimony on the ground those statements were involuntary. He claims he was not in such a state of mind that he could knowingly and intelligently waive his fifth amendment privilege.

---

**1.** We affirmed Taylor's convictions in *State v.*     *Taylor*, 336 N.W.2d 721 (Iowa 1983).

He also objected at his trial that the record did not support submission of first and second degree murder, manslaughter and willful injury instructions to the jury. This contention was renewed in a motion for new trial in which defendant asserted the jury verdict was contrary to the evidence.

■ The scope of our review was explained in *State v. Cullison*, 227 N.W.2d 121, 126 (Iowa 1975). We review the challenge to the sufficiency of the evidence on assigned error. Our review of the trial court order overruling the motion to suppress is *de novo*.

I. The trial court instructed the jury it could find defendant guilty of first degree murder in the death of officer Rice on alternative grounds: felony murder or willful, premeditated, and deliberate murder. The felony implicated in the felony murder charge was willful injury. In the death of officer Hoing the jury was instructed only on willful, premeditated, and deliberate murder.

To demonstrate felony murder the State undertook to show that Phams participated in the felony offense of willful injury and that while doing so Taylor aided and abetted Phams and, with malice aforethought, shot Rice. The State's theory was that defendant committed the offense of willful injury by striking and injuring Rice with a metal chair, that Taylor aided and abetted Phams by joining the struggle with Rice, and that Taylor's murder of Rice was causally related to Phams' offense of willful injury. Defendant argues the evidence fell short in four respects.

A. *Participation in an offense.*

Defendant first contends there was conflicting and insufficient evidence to show he struck Rice with a chair or that the chair caused Rice's head injuries. Apparently there was no blood found on defendant and no identifiable fingerprints were found on the chair.

■ There was, however, ample evidence of participation. Defendant admitted at the Taylor trial that he struck Rice with a chair. There was expert testimony that Rice's head wounds would be the type of wounds caused by the metal chair found near Rice's body. There was other expert testimony that blood patterns on the chair were consistent with the blow that would have been sustained by Rice. A blood smear on the chair measured approximately the same length as the laceration on Rice's head. Finally, eye witness testimony from a person across the street indicated that the person who knocked Rice off the porch also hit him with the chair.

B. *Willful injury.*

Willful injury is committed when one does an act which is not justified and which is intended to cause and does cause serious injury to another. Iowa Code § 708.4 (1981). "Serious injury" is a disabling mental illness, or bodily injury which creates a *substantial risk of death* or which causes *serious permanent disfigurement*, or protracted loss or impairment of the function of any bodily member or organ. Iowa Code § 702.18.

■ The State need not prove that the offense of willful injury was successfully completed. Under felony murder it is only required that the State prove defendant was *participating* in the underlying felony. *State v. Aswegan*, 331 N.W.2d 93, 98 (Iowa 1983). *See* Iowa Code § 702.13 (person "participates" in public offense "whether the person is successful or unsuccessful in committing the offense").

Defendant argues that the State produced insufficient evidence to prove that the cuts to Rice's head and ear amounted to "serious injury." He argues the injuries would not have created a "substantial risk of death" because there was no skull fracture and Rice could not have bled to death because he would have received immediate medical attention. He argues there would have been no "serious permanent disfigurement" because Rice's hair would have covered a scar on his head and the scar on his ear would not have made it look twisted or mutilated.

■ Regarding the issue of "substantial risk of death" we have said:

> ... [S]erious injury means something more than the "pain or injury" element in the assault statute, section 708.1(1). [Authority.] ... [A] substantial risk of death means more than just any risk of death but does not mean that death was likely. If there is a "real hazard or danger of death," serious injury is established. [Authority.]

*State v. Anderson*, 308 N.W.2d 42, 47 (Iowa 1981) (substantial risk of death where eighty-five year old woman was sexually abused, and suffered two broken ribs and several bruises and beating to her body and head; "death of this victim from these injuries was 'certainly possible,'" even though not major risk). *See also State v. Epps*, 313 N.W.2d 553, 557 (Iowa 1981) (substantial risk of death where victim shot in face with handgun at close range, knocking him to floor and causing temporary unconsciousness, and bullet, lodging in left sinus cavity, damaged nasal bone and structure); *State v. Cross*, 308 N.W.2d 25, 26 (Iowa 1981) (suggesting substantial risk of death where victim suffered choking, three inch gash in head, bites to breasts, and other lacerations and bruises). Under this record there was ample evidence to support a jury finding that there was a substantial risk of death to Rice when defendant attacked him with the chair.

There was also ample evidence to support a finding that the injuries would leave him with "serious permanent disfigurement." We have recognized that the statutory definition of serious injury includes those "injuries which leave the victim 'permanently scarred or twisted ..., [in contrast to] a black eye, a bloody nose, and even a simple broken arm or leg.'" *Epps*, 313 N.W.2d at 557 (quoting 4 J. Yeager & R. Carlson, Iowa Practice and Procedure § 45 (1979)).

### C. *Taylor's aiding and abetting.*

On the question of "aiding and abetting" we have said:

> One cannot be convicted of a crime upon a theory of aiding and abetting unless there is substantial evidence to show he assented to or lent countenance and approval to the criminal act either by active participation in it or by some manner encouraging it prior to or at the time of its commission. Guilt may be established by circumstantial evidence. Knowledge is essential, but neither knowledge nor presence at the scene of the crime is sufficient to prove aiding and abetting. [Authority.]
>
> ....
>
> The underlying precept of aiding and abetting is a requirement that the accessory in some way "associate himself with the venture, that he participate in it as something he wishes to bring about, that he seek by his action to make it succeed." [Authority.]

*State v. Lott*, 255 N.W.2d 105, 107, 108 (Iowa 1977). *See also State v. Galvan*, 297 N.W.2d 344, 348–49 (Iowa 1980); *State v. Cuevas*, 281 N.W.2d 627, 631 (Iowa 1979); *State v. Jones*, 271 N.W.2d 761, 763 (Iowa 1978).

■ Under this record we think there was ample evidence of Taylor's active participation in defendant's willful injury assault upon the officer. Taylor was near the porch when defendant knocked Rice from it. Taylor ran over to join the struggle and began to punch Rice. Taylor then grabbed Rice's handgun, told defendant to move, and fired two fatal shots into Rice's chest when defendant did move.

### D. *Causation.*

Regarding the requisite connection between the murder and the felonious offense we have said:

> A murder is committed during the perpetration of a felony under section 690.2 "if it results as an incident to the felony and is associated with the felony as one of its hazards. It is not necessary for application of the doctrine that the murder be contemporaneous with the felony.... A lapse of time and distance are factors to be considered but are not determinative."

*State v. Aldape*, 307 N.W.2d 32, 40 (Iowa 1981) (quoting *State v. Conner*, 241 N.W.2d 447, 464 (Iowa 1976)). *See also State v. Taylor*, 287 N.W.2d 576, 577 (Iowa 1980) (felony murder must be based on causally related felony and acts causing death).

■ Defendant contends the evidence fails to show sufficiently that the willful injury and murder were causally related. He believes Taylor acted independently and that therefore he could not reasonably have foreseen Taylor would shoot Rice. We disagree. The jury could have concluded that, by knocking and pinning Rice to the ground while Taylor joined in the struggle, defendant gave Taylor the opportunity to obtain Rice's gun. The resulting murders were clearly "associated with the felony as one of its hazards."

■ II. Defendant separately contends the State failed to present sufficient evidence to show he aided and abetted Taylor in either murder. In the preceding division, we defined aiding and abetting. The State was required to prove beyond a reasonable doubt: that Taylor shot Rice and Hoing willfully, deliberately, with malice aforethought, premeditation, and a specific intent to kill; and that defendant knowingly aided and abetted Taylor in the commission of the act.

Defendant challenges the sufficiency of the evidence to support three aspects of the showing: (1) defendant's active participation in the murder; (2) defendant's intent; and (3) defendant's knowledge of Taylor's intent.

■ We think there was evidence sufficient to show defendant's active participation in the testimony that defendant was still holding Rice while Taylor brought Rice's gun straight up and out of its holster. There was testimony that at that time Rice's hands were not visible, he was wiggling his hips, and defendant was still on top of him. There was testimony that defendant immediately relinquished control of Rice when Taylor directed him to "move." On the basis of this testimony a jury could easily find beyond a reasonable doubt that defendant had Rice pinned when Taylor obtained the gun.

■ With regard to defendant's intent the State presented two types of circumstantial evidence to show that defendant struck, fought, and held Rice willfully, deliberately, with malice aforethought, premeditation, and a specific intent to kill. The first was evidence that defendant's animosity toward whites and police officers gave him a motive to kill. There was testimony of defendant's statements and actions after the shooting, previously discussed. There was additional testimony of defendant's statements while in jail that he did not like white people, that he was going to kill a white person, that the police department was lucky there were not more than two officers shot, and that he did not want a white attorney to represent him. There was psychiatric testimony that defendant had difficulty dealing with authority figures.

The second type of circumstantial evidence presented by the State was testimony regarding the manner in which defendant severely injured Rice with the metal chair. This injury and the use of the metal chair at that time is some evidence of defendant's extreme hatred of white police officers. The jury could conclude, under the circumstances, that the intent to kill extended to both officers then being attacked. In *State v. Mulder*, 313 N.W.2d 885, 888 (Iowa 1981), *cert. denied*, —— U.S. ——, 103 S.Ct. 90, 74 L.Ed.2d 83 (1982), we said: "the use of a deadly weapon accompanied by an opportunity to deliberate is evidence of malice, deliberation, premeditation, and intent to kill." *See also State v. Mart*, 237 Iowa 181, 187, 20 N.W.2d 63, 66 (1946) (weapon is "deadly" if it is such that from manner of its use it is likely to cause death). The jury could find beyond a reasonable doubt that defendant possessed an intent to kill both officers when he gave Taylor the opportunity to obtain the use of Rice's gun.

■ Evidence of defendant's knowledge of Taylor's intent was shown by testimony

that, shortly before the officers arrived, defendant was present during a conversation in which Taylor loudly stated his dislike for whites and police officers. Taylor was quoted as saying that, given the chance, he would "waste" a cop. There was also testimony that it took Taylor two or three attempts to remove Rice's gun from its holster. The showing is strengthened by evidence that defendant freely complied and rolled off Rice when Taylor directed him to do so.

From the foregoing a jury could find beyond a reasonable doubt that defendant held Rice with knowledge of Taylor's intent to obtain and use Rice's gun to kill the two officers. The defendant's first assignment is without merit.

III. Defendant's second assignment of error, challenging an evidentiary ruling, is based on his contention he lacked mental capacity to understand the meaning of his fifth amendment right against self incrimination and therefore did not make a knowing and intelligent waiver of those rights at the Taylor trial.

We reviewed the cases on this question in *State v. Davidson*, 340 N.W.2d 770, 771 (Iowa 1983). In addition to what is said there the State points out that an accused's prior experience with police, *State v. Aldape*, 307 N.W.2d at 37 (Iowa 1981), or exhibited understanding of his constitutional rights, *State v. Jump*, 269 N.W.2d 417, 424 (Iowa 1978), are also factors to be considered in the totality of the circumstances.

Defendant argues he was suffering from a mental disorder when he waived his fifth amendment right at the Taylor trial. In support of this contention he argues the following facts. He had a long history of psychiatric problems and thirteen years of mental hospitalizations. There was testimony he is borderline mentally retarded and suffers from "schizophrenic affective disorder." Characteristics of the disorder include disorganized and abnormal thought processes and misinterpretations of reality.

Defendant argues that prior to the Taylor trial he did not receive an adequate explanation of his fifth amendment right or the ramifications of testifying. The attorney who spoke with him prior to the trial testified that he never felt he was communicating with defendant concerning the consequences of the subpoena. The attorney testified he believed defendant did not understand his advice.

Defendant points to the fact that the court in the Taylor trial knew of his psychiatric problems and the State never showed he understood his rights despite those problems. Taylor's attorney testified of his belief that defendant appeared to behave as though he would have answered any questions asked him without thinking of their ramifications. Defendant's testimony at the Taylor trial included an apparent delusion that Taylor and the police officers were actors.

The State, on the other hand, points to a number of circumstances to support the conclusion of the judge in the Taylor trial that defendant's waiver was voluntary. Defendant has a multitude of prior arrests and convictions so that he is well experienced in police matters. Prior to the Taylor trial defendant expressly exercised his fifth amendment right when he was arrested and when he filed for a habeas corpus writ. An attorney advised defendant not to testify at Taylor's trial but Phams indicated he wanted to do so anyway. The judge in the Taylor trial clearly and carefully informed defendant of his rights prior to letting him testify and repeatedly reminded him of his rights during cross-examination. Defendant told the judge he understood his rights and was willing to testify. Defendant responded directly, coherently, and accurately to all questions during his testimony. Defendant had previously related substantially the same details of his testimony to both psychiatrists who interviewed him.

Defendant's apparent delusion (that Taylor and the police officers were actors) did not occur during his testimony. Rather, defendant merely was repeating the "delusion" he previously related to a psychiatrist. Psychiatric testimony revealed de-

fendant had good present knowledge, despite his disorder, so he was capable of understanding where he was and of choosing if he desired to remain silent.

On our *de novo* review we find that the defendant had the mental capacity to understand the meaning of his fifth amendment right at the Taylor trial and that his waiver of his fifth amendment right was made knowingly and intelligently. We believe that the situation is like that described in *Aswegan*, 331 N.W.2d at 96:

> There is nothing in the record before us to indicate the claimed "delusions" evidenced in defendant's testimony were other than a last-ditch, desperate attempt to avoid the State's overwhelming evidence against him. That there was no logical and convincing explanation available to counteract the State's evidence does not mean defendant's illogical and unconvincing excuses were manifestations of delusions.

AFFIRMED.

All Justices concur except CARTER, J., who dissents.

CARTER, Justice (dissenting).

The decision of the court in the present appeal upholds two convictions for first degree murder on evidence which is legally insufficient to support even a charge of manslaughter.

Defendant Joseph Phams was inside his home lying on a couch when two police officers came to quell a disturbance outside. The police presence led to an altercation between one of the officers and defendant's brother which commenced while defendant was still inside his house. Defendant emerged from the house and attacked the other officer knocking him to the ground. He continued to attack the officer striking him with a chair and then pinning him to the ground.

While the defendant continued to struggle with the officer, James Taylor, one of the parties to the disturbance which had precipitated the presence of the police, struck that officer with his fist, removed the officer's service revolver from its holster, and shot and killed both of the officers.

Taylor was charged, tried, and convicted of first degree murder with respect to both killings. While that result is justified on Taylor's part, there is no way the scenario just described can support defendant's conviction of first degree murder with respect to the death of either officer. The State's case is so legally insubstantial it falls of its own weight.

With respect to the death of officer Rice (the policeman with whom defendant was struggling) the State seeks to sustain the conviction on alternative theories of felony murder and willful, premeditated murder. The evidence is insufficient to sustain that conviction under either theory. The underlying felony relied on by the State to support a felony murder conviction is willful injury as defined in Iowa Code section 708.4 (1981).

A majority of jurisdictions have refused to construe felony murder statutes so as to permit the type of bootstrapping which flows from predicating felony murder convictions on felonious assaults. We recently took a contrary position, however, in *State v. Beeman*, 315 N.W.2d 770, 776–77 (Iowa 1982) where we upheld a felony murder instruction based on willful injury. Although *Beeman* now permits felony murder convictions to be based on willful injury the record does not permit this result in the present case.

The State's theory of its felony murder charge is legally invalid. It bases that charge on the proposition that Taylor was aiding and abetting defendant in perpetrating a willful injury offense upon officer Rice which resulted in officer Rice's murder.

The doctrine of felony murder in its abstract form relates to the criminal responsibility of a single defendant for his own actions. The criminal liability of one party for the act of another in felony murder prosecutions is not based on principles of felony murder but rather upon the law of

joint responsibility for criminal acts. The issue in the present case is posed as follows in W. LaFave & A. Scott, Jr., *Criminal Law* section 71, at 553 (1972):

> Many of the felony-murder cases involve co-felons only one of whom accidentally or intentionally fires the fatal shot. That person is of course liable for intent-to-kill murder if the shot is fired with intent to kill or of felony murder if it is fired accidentally in the commission of the felony and death is foreseeable. Are his co-felons also liable? This is not so much a matter of felony murder as a matter of parties to crime....

It can be argued that the correct legal theory of "parties to crime" to be applied in felony murder situations is not aiding and abetting. Some commentators believe that aiding and abetting only creates criminal liability on the part of the aider and abettor for the same crime that the principal commits. Guilt of the principal is attributed to the aider and abettor. J. Yeager & R. Carlson, *Criminal Law and Procedure* § 62 (1979) (hereinafter Yeager & Carlson). Those commentators believe aiding and abetting does not make either the principal or the aider and abettor liable for a different crime committed by the other. They assert that the theory of vicarious liability which is involved in multiple party felony murders is not aiding and abetting but rather joint criminal conduct as defined in Iowa Code section 703.2 (1981). *Id.* With respect to joint criminal conduct Yeager & Carlson state:

> [Section] 703.2 will sometimes impose vicarious liability on one for an offense which he does not intend to commit and which he may not have actually forseen. The conditions are that he must be acting in concert with another....

*Id.* at § 63. "Concerted action" is defined in Black's Law Dictionary 262 (5th ed. 1979) as:

> Action which has been planned, arranged, adjusted, agreed on and settled between parties acting together pursuant to some design or scheme.

We have not recognized the distinction which Yeager & Carlson draw between conduct falling under section 703.1 and section 703.2, respectively, in felony murder cases decided prior to their enactment. In *State v. Conner*, 241 N.W.2d 447, 462–63 (Iowa 1976) we used an aiding and abetting analysis in upholding a conviction based on felony murder. It is significant, however, that the joint criminal acts involved in the underlying felony in *Conner* would have satisfied the elements of concerted action which Yeager & Carlson now attribute to section 703.2. Moreover, the theory of the State in *Conner* was that the defendant was an aider and abettor of the actual killer in the perpetration of a robbery. In the present case the State's theory is that Taylor was the aider and abettor and defendant was the principal in the underlying felony. Vicarious liability in aiding and abetting cases flows from and not toward the principal.

In any event, conduct creating a vicarious liability under either section 703.1 or section 703.2 must be established vis-a-vis the acts of the party sought to be charged. As we stated in *State v. Lott*, 255 N.W.2d 105, 107 (Iowa 1977):

> One cannot be convicted of a crime upon a theory of aiding and abetting unless there is substantial evidence to show he asserted to or lent countenance and approval to the criminal act [of the other] either by active participation in it or by some manner encouraging it prior to or at the time of its commission.

Under the State's felony murder claim this standard requires "substantial evidence" that defendant was knowingly acting in concert with Taylor with respect to a feloneous assault upon officer Rice; that he lent countenance and approval to Taylor's acts.

No reasonable inference may be drawn from the present facts which would aid the State in establishing this proposition. Defendant was fully occupied in a violent struggle with officer Rice prior to Taylor's entry into the fray. There is absolutely no evidence that he was aware of Taylor's

intent to become involved prior to the latter's hasty attack upon the officers. By this time defendant was in no position to do anything about it. Neither continued struggle on defendant's part nor his getting out of the way when commanded to do so are sufficient to establish that he was lending countenance to Taylor's actions. Statements made after the crime that he was glad that the officers were dead do not show countenance "prior to or at the time" of Taylor's actions. The evidence does not even satisfy a preponderance of evidence standard of proof on this essential element of the crime—the State's burden is proof beyond a reasonable doubt.

The lack of proof which exists with respect to defendant's lending countenance to Taylor's acts in the underlying felony of willful injury carries over to the State's alternative theory that he is guilty of first degree murder because he aided and abetted Taylor in committing murder. The majority spends much time in its opinion discussing the intent element of the crime. I disagree with the conclusion that the evidence supports a finding that defendant intended to kill either officer or was aware of Taylor's intent to do so in time to have done anything about it. A more obvious defect in the State's case, however, is that regardless of defendant's intent there is no evidence that he was acting in concert with or in aid of Taylor with respect to either killing.

Because the State failed to prove defendant was acting in concert with Taylor or gave countenance to his acts prior to or at the time of their commission he cannot be convicted of any crime with respect to officer Hoing's death. With respect to officer Rice, defendant committed a crime but there is no proof it caused his death. Defendant's conviction should be reversed as to both murders, the Hoing information should be dismissed and retrial on the Rice information should be limited to those included offenses below manslaughter.