# IN THE COURT OF APPEALS OF IOWA

No. 21-1208
Filed January 11, 2023

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**JOSHUA JAMES PENDLETON,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Webster County, Gina C. Badding,

Judge.


        The defendant appeals his convictions for first-degree murder and first-

degree robbery. **AFFIRMED.**



        Martha J. Lucey, State Appellate Defender, and Melinda J. Nye, Assistant

Appellate Defender, for appellant.

        Brenna Bird, Attorney General, and Zachary Miller, Assistant Attorney

General, for appellee.


        Heard by Tabor, P.J., and Schumacher and Chicchelly, JJ.  Badding, J.,

takes no part.

**TABOR, Presiding Judge.**

Joshua Pendleton killed Pastor Allen Henderson outside St. Paul's Lutheran Church in Fort Dodge. Pendleton also took the pastor's cell phone. For those acts, a jury convicted Pendleton of first-degree murder and first-degree robbery. On appeal, Pendleton contends his statements to law enforcement that day should have been suppressed. He also challenges the sufficiency of the evidence for robbery and for one of two alternative theories marshalled for first-degree murder. In doing so, he contests the constitutionality of Iowa Code section 814.28 (2019) on general verdicts.

Because Pendleton's statements to police were neither involuntary nor obtained in violation of his constitutional rights, the district court properly allowed them into evidence. And because the proof was sufficient to support both theories of first-degree murder, we affirm the convictions without reaching the constitutionality of the statute.

## I. Facts and Prior Proceedings

Parishioner Erika, and her son, H.K., arrived early for his confirmation class at St. Paul's. When they arrived around 5:20 p.m., all the entrances were locked. But using her church key, Erika and H.K. entered through the main doors and settled into the parish office. Pastor Henderson shut off his computer in the office and headed into the fellowship hall. As Erika and H.K. conversed in the office, they heard a sound. Erika recognized the pastor's voice, saying: "What are you doing here? Why are you here? You don't belong here." Soon she and H.K. moved to the fellowship hall.

After finishing some homework, H.K. went to look for the pastor. The boy took a hallway by the kitchen toward the back door. Erika testified, "Next thing I know, he comes running back telling me, 'Mom, Pastor's on the ground with blood coming out of his head.'" Looking out the back door, Ericka saw Henderson on the ground. She called 911.

When paramedics arrived, they first noted the pastor's head injury. They then checked for vital signs, finding no pulse and no respirations. Their efforts to resuscitate him did not succeed. An autopsy recorded a ligature mark on the pastor's neck, as well as bleeding inside his brain. The medical examiner identified the cause of death as "blunt force injury of the head with strangulation."

Back at the crime scene, investigators found evidence of a struggle. Drywall was damaged in the hallway just inside the church door. The pastor's glasses were on the floor. And the pastor's gun was under his body. On the sidewalk just outside the back door, investigators found a rope with a metal clasp.

Church surveillance cameras captured some of the action. The video showed a man wearing a dark jacket, jeans, and red shoes walking beside the church carrying a rope. The man turned a corner and did not re-emerge for nearly ten minutes. When he appeared on camera again, his right sleeve was rolled up and the rope was gone. But now he was glancing at a cellphone in his right hand.

It didn't take investigating officers long to recognize the man in the video as Pendleton. They knew Pendleton from previous encounters involving his unstable mental health. After identifying Pendleton from the surveillance footage, officers walked to his apartment, just two blocks from the church. The apartment was empty. But officers spotted Pendleton in the front yard walking toward them. He

spoke to them in a stilted manner,[1] claiming he heard a girl screaming at the church. "He was molesting little girl. I got his phone right here. . . . He wouldn't give it up." Officers placed Pendleton in handcuffs.

At the police station, Detective Larry Hedlund interviewed Pendleton. He gave Pendleton *Miranda* warnings[2] and obtained a written waiver. Pendleton started with this narrative:

> That man was very strong. I had to bite him in head. . . . He tried to claw my eyes out. . . . I can't believe how strong he was. And I was struggling because the last thing I wanted was for him to shut the door and get back in to little girl. 'Cause I thought he might get rid of her.

Hedlund next asked about the rope on the ground. Pendleton responded: "That's my hemp belt . . . I brought it there. I heard little girl screaming. . . . I ring bell. And he sees me in door." Pendleton claimed that he held up his hemp belt and told Henderson, "I got present for little girl," as a ruse to get the pastor to open the door. Pendleton admitted that when Henderson opened the door, he wrapped the rope around the pastor's neck.

When Hedlund asked about the hole in the drywall, Pendleton answered: "I made it." Pendleton then described the pastor pushing the rope off his neck while Pendleton held the back door open with his foot. Pendleton also said he bit Henderson on the head "because he was overpowering me."

---

[1] Throughout the evening, Pendleton slipped in and out of a Russian accent, featuring grammar lapses.
[2] *See generally Miranda v. Arizona*, 384 U.S. 436 (1966).

As for the pastor's cellphone, Pendleton explained: "I said give me phone because he . . . had it in pocket. I said I'm taking phone because I thought he was recording it. . . . I thought he was trying to record his sex acts with the little girl."

Pendleton then decided he would end the interview: "I'm not gonna talk anymore, can I leave?" And he asked for an attorney. Hearing those invocations, Hedlund stopped the interview and arrested Pendleton.

In October 2019, the State charged Pendleton with first-degree robbery for taking Henderson's cellphone and first-degree murder, alleging both premeditation and participation in the forcible felony of robbery. The court halted proceedings in February 2020, finding that Pendleton was not competent to stand trial. After he received treatment for his schizophrenia, Pendleton's prosecution resumed in June 2020. That fall, he gave notice of his intent to raise an insanity defense.

Pendleton also moved to suppress statements he made to police on the day of his arrest. In considering suppression, the district court divided his statements into four phases: (1) when he was handcuffed outside his apartment; (2) when he was at the police station but before the *Miranda* waiver; (3) after he signed the written waiver of his *Miranda* rights; and (4) after he invoked his *Miranda* rights to remain silent and counsel. The court suppressed statements Pendleton made during the second and fourth phases but allowed all other statements.

At trial, the court instructed the jury to find Pendleton guilty of first-degree murder if it found that he either "acted willfully, deliberately, premeditatedly, and with a specific intent to kill" or "was participating in the offense of robbery in the first or second degree." On general verdict forms, the jury found Pendleton guilty of first-degree murder and first-degree robbery. Pendleton appeals.

**II. Analysis**

Pendleton makes two arguments. First, he contends that the district court should have suppressed all statements he made to police on the day of his arrest. Second, he insists the State presented insufficient proof of felony murder. And from there, he challenges the constitutionality of Iowa Code section 814.28, which allows courts to uphold a general verdict if substantial evidence supports at least one alternative theory.

**A. Suppression of Statements**

The Fifth Amendment of the U.S. Constitution and article 1, section 9 of the Iowa Constitution protect a criminal defendant from compulsory self-incrimination. *See* U.S. Const. amend V; Iowa Const. art. 1, § 9; *State v. Gibbs*, 941 N.W.2d 888, 894 (Iowa 2020). "When a defendant challenges the denial of a motion to suppress based on an asserted constitutional violation, we review the district court ruling de novo." *State v. Sallis*, 981 N.W.2d 336, 344981 (Iowa 2022). "We examine the entire record to independently evaluate the totality of the circumstances based on each case's unique situation." *State v. Price-Williams*, 973 N.W.2d 556, 531 (Iowa 2022). We defer to the district court's fact findings, especially on witness credibility, but we are not bound by them. *Id.* "We consider both the evidence introduced at the suppression hearing as well as the evidence introduced at trial." *State v. Hunter*, 947 N.W.2d 657, 660 (Iowa Ct. App. 2020) (quoting *State v. Palmer*, 791 N.W.2d 840, 844 (Iowa 2010)).

Pendleton's suppression argument is threefold. First, he seeks to exclude his replies to police questions after he was handcuffed but before he was Mirandized. Second, he claims his *Miranda* waiver was not knowing and voluntary.

And third, he contends all his statements were involuntary because he was suffering from unmedicated schizophrenia.

### 1. Volunteered Statements

A failure to provide a *Miranda* advisory warrants suppression of a suspect's statements made during a custodial interrogation. *State v. Countryman*, 572 N.W.2d 553, 557 (Iowa 1997). Custody means police have limited a suspect's freedom to act on the scale of a formal arrest. *State v. Bogan*, 774 N.W.2d 676, 680 (Iowa 2009). Interrogation includes both express questioning, as well as words or actions that an officer would know were reasonably likely to elicit an incriminating response. *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

We consider the police encounter with Pendleton outside his apartment. As captured on their body cameras, Pendleton approached the officers claiming to have heard a girl screaming. Officer Evan Thompson replied "okay" and then directed Pendleton to "show me your hands real quick." Thompson then handcuffed Pendleton, saying: "I just want to detain you at this point." Pendleton responded, "That's fine." And before officers asked any questions, Pendleton made a muffled statement that ended with "had taser in pocket." Asking for clarification, Thompson responded "okay who's that?" Pendleton answered "that's a bad man down there." Thompson asked, "down by the church there?" And Pendleton responded yes.

Thompson then introduced Detective Hedlund and asked Pendleton whether he would speak to Hedlund at the station. Pendleton looked at the detective and volunteered: "Yes, he was molesting little girl." Pendleton continued, telling officers that he had taken Henderson's phone. Officers asked Pendleton if

he had any weapons, patted him down, and prepared to transport him to the station. During the pat down, the officer said, "this is just for our safety." Pendleton responded "I wouldn't hurt nobody innocent" and recalled asking Henderson "what are you doing to that little girl?"[3]

Pendleton argues that he was in custody and subjected to interrogation as soon as he encountered the officers. Like the district court, we agree he was in custody but not interrogated. "Statements made after a person is taken into custody are not automatically considered the product of interrogation." *State v. Turner*, 630 N.W.2d 601, 608 (Iowa 2001). For instance, "statements that are volunteered, spontaneous and freely made by an arrested person do not come within the scope of *Miranda*." *Id.*

Pendleton points to two exchanges when officers knew they would elicit an incriminating response. First, Officer Thompson asked "who's that?" after Pendleton mentioned someone having a taser. Because that question focused on a safety matter related to Pendleton's detention, we do not find a *Miranda* violation. *See State v. Sallis*, 574 N.W.2d 15, 18 (Iowa 1998) (quoting *Innis*, 446 U.S. at 301); *see also New York v. Quarles*, 467 U.S. 649, 657 (1984) (recognizing *Miranda* exception in situation imperiling public safety).

Second, Thompson asked Pendleton if he would speak to Detective Hedlund. In a non-responsive reply, Pendleton asserted he would not harm an innocent person. Contrasting that assertion with his distorted belief about the pastor, Pendleton said he caught Henderson "in the act" of molesting a girl.

---

[3] Pendleton said Henderson at one point told him it was not a little girl but a little boy, in apparent reference to H.K.

Contrary to Pendleton's argument, Thompson had no reason to know that his benign inquiry would encourage Pendleton to incriminate himself on the spot. Pendleton's volunteered statement was not the product of interrogation. *See State v. Brown*, 176 N.W.2d 180, 183 (Iowa 1970).

Pendleton's statements at his apartment were admissible.

### 2. Miranda Waiver

Next, Pendleton lobbies for the suppression of his statements made after the *Miranda* waiver. At the police station, Detective Hedlund joined Pendleton in an interview room. About five minutes in, Hedlund showed Pendleton a *Miranda* rights form. Pendleton read his rights out loud and then signed the waiver.[4] To be valid, a *Miranda* waiver must be knowing, intelligent, and voluntary. *State v. Tyler*, 867 N.W.2d 136, 174 (Iowa 2015). A waiver is voluntary when it is "the product of the suspect's free and deliberate choice rather than intimidation, coercion, or deception" by the police. *Id.* (citation omitted). We look at the totality of the circumstances and these factors:

> Defendant's age; whether defendant had prior experience in the criminal justice system; whether defendant was under the influence of drugs; . . . whether defendant was mentally "subnormal"; whether deception was used; whether defendant showed an ability to understand the questions and respond; the length of time defendant was detained and interrogated; defendant's physical and emotional reaction to interrogation; whether physical punishment, including deprivation of food and sleep, was used.

---

[4] While not alone sufficient, a written waiver provides "strong proof" of voluntariness. *Countryman*, 572 N.W.2d at 559.

*Id.* at 175 (citation omitted). Among these factors, Pendleton focuses on his mental condition: untreated schizophrenia. He contends his *Miranda* waiver was involuntary because he was "under the influence of schizophrenic hallucinations."

It's true that Pendleton had struggled with schizophrenia for at least fifteen years. His mother testified that two weeks before the killing, he had been experiencing auditory and visual hallucinations because he was not taking his medication. She tried to get her son help, but he was unwilling to accept treatment from the mental-health center.

What's not as clear cut is the effect of Pendleton's schizophrenia on his ability to waive *Miranda* and answer the detective's questions. Experts at trial gave conflicting opinions on Pendleton's mental state.[5] The State offered testimony from Pendleton's treating physician. Dr. Gary Keller diagnosed Pendleton with schizoaffective disorder, bipolar type, and amphetamine use disorder. But because the doctor did not treat Pendleton until months after the interrogation, he could not distinguish if Pendleton's behaviors stemmed from prolonged drug use or his mental illness.

The defense countered with testimony from neuropsychologist Daniel Tranel, who evaluated Pendleton over one year after the incident. Dr. Tranel believed Pendleton was acting under "a diseased or deranged condition of the mind" on the day of the killing. But on cross-examination, Dr. Tranel acknowledged that he did not review the videos from that day. Another defense expert witness, psychiatrist Arnold Andersen, examined Pendleton for competency in January

---

[5] At oral argument, the parties agreed that trial evidence supporting and opposing Pendleton's insanity defense was relevant to this suppression question.

2020, about four months after the killing. Dr. Andersen observed that Pendleton was "behaving very abnormally" and his statements were "nonsensical." But Dr. Anderson also did not review video from the day of the killing.

In contrast, the State's rebuttal expert, psychiatrist James Dennert, examined all the video evidence before forming his opinion. He considered that footage as "[t]he best evidence for [Pendleton's] state of mind at the time of the incident." In Dr. Dennert's opinion, Pendleton "did not suffer any mental impairment or derangement" that day. Not at the time of the killing. And not at the time of the interrogation. Dr. Dennert noted that Pendleton highlighted "a logical inconsistency" in the *Miranda* warning for Detective Hedlund. Dr. Dennert also testified about Pendleton's ability to understand the interrogation process:

> Throughout the interview, he responded appropriately. He asked pertinent questions. His comments were pertinent and appropriate. He seemed to understand the situation and he said things and did things that reasonably interpreted as indicating that he is trying to present himself in the light that he wishes to present himself.

While the evidence on Pendleton's psychiatric condition was mixed, we are persuaded by Dr. Dennert's assessment that his "mental subnormality" did not prevent Pendleton from knowingly and voluntarily waiving his *Miranda* rights. *See State v. Davidson*, 340 N.W.2d 770, 773 (Iowa 1983) (stating that "mental subnormality does not itself deprive a waiver or confession of voluntariness").

Furthermore, when we turn to the totality of the circumstances, most of the factors weigh on the side of a knowing and voluntary waiver. For instance, Pendleton was thirty-six years old and had previous encounters with police, having been arrested for minor offenses. The record does not suggest Pendleton was under the influence of drugs. Nor did the detective use deception. To the contrary,

Hedlund's approach was clear and straightforward.  He did not intimidate, coerce, or trick Pendleton into waiving his rights.  *See Tyler*, 867 N.W.2d at 174.  The interview format was not coercive.  The questioning took place the evening of the killing, but not late into the night.  It lasted less than thirty minutes.  Pendleton was offered a drink and received a can of diet Mountain Dew.

And Pendleton was not daunted by the setting.  One example: in the middle of his *Miranda* warning, Pendleton declared, "I don't need legal representation, I have the truth."  Hedlund said "okay" and asked Pendleton to keep reading.  When Hedlund confronted Pendleton about his Russian accent, the suspect explained—in a self-deprecating manner—that he picked it up from a phone app and he fakes an accent because it is "appealing to women."

In deciding whether his mental condition prevented a voluntary waiver or confession, we look to Pendleton's "comportment and demeanor."  *See Davidson*, 340 N.W.2d at 773.  Pendleton remained calm and cooperative until the end when Hedlund arrested him for murder.  Even if he were experiencing symptoms of schizophrenia, Pendleton's demeanor and discussion showed he understood his *Miranda* rights and made a voluntary waiver.

That understanding was on display when Pendleton invoked his right to silence and right to counsel.  Pendleton asked if the interview was being recorded; Hedlund responded, "of course," and pointed at a camera in the corner.  When Hedlund posed another question, Pendleton declared, "I'm not gonna speak anymore.  Can I go?"  Hedlund replied: "I need to check on something."  Pendleton then insisted, "I want lawyer."  Hedlund ended the interview but asked to photograph Pendleton's hands.  At first, Pendleton agreed but then changed his

mind: "no, I don't want pictures of hands here until lawyer comes." This exchange shows Pendleton understood his rights and knew how to invoke them, bolstering the inference that he knowingly and voluntarily waived them earlier. From our de novo review, we find Pendleton's post-*Miranda* statements were admissible.

### 3. Due Process Violation

Pendleton closes with an argument that all of his statements to police were involuntary and therefore admitting them into evidence violated his right to due process. The test for voluntariness is the same under *Miranda* as it is for due process. *Tyler*, 867 N.W.2d at 176. So for the reasons recited in the previous section, we find Pendleton voluntarily made his statements to police.[6]

### B. Substantial Evidence

"We review sufficiency of the evidence claims for correction of errors at law." *State v. Crawford*, 974 N.W.2d 510, 516 (Iowa 2022). We consider whether, when taken in the light most favorable to the State, the verdicts are supported by substantial evidence. *Id.* Evidence is substantial if it would convince a rational trier of fact that Pendleton is guilty beyond a reasonable doubt. *Id.*

Pendleton argues we should vacate his robbery conviction because the State offered insufficient evidence of his intent to commit a theft. What's more, if the State did not prove robbery, according to Pendleton, it did not prove the forcible

---

[6] The State contends that because Pendleton confessed to killing Henderson and advanced an insanity defense, admitting his statements was harmless error. Because we reject his suppression arguments, we need not address this alternative contention.

felony alternative of first-degree murder, requiring that conviction to be overturned as well.[7]

Granted, the jury returned general verdicts on the two murder alternatives.[8] Under prior law, if the evidence was insufficient under one alternative, we would not try to divine which alternative the jury embraced and instead would reverse for retrial. *See, e.g.*, *State v. Tyler*, 873 N.W.2d 741, 754 (Iowa 2016). But Iowa Code section 814.28, enacted in 2019, now prohibits reversing a general verdict "on the basis of a defective or insufficient theory if one or more of the theories presented and described . . . is sufficient to sustain the verdict on at least one count." Pendleton challenges section 814.28 on constitutional grounds, arguing it violates the separation of powers, due process, and equal protection.[9] But we need not reach those arguments because both alternatives are supported by the record.

We start with the robbery instructions. To convict Pendleton of first-degree robbery, the jury had to find:

---

[7] Pendleton does not challenge the State's proof of premediated murder.

[8] To convict Pendleton of first-degree murder, the jury had to find:
>      1. On or about the 2nd day of October 2019, Mr. Pendleton struck and/or strangled Allen Henderson
>      2. Allen Henderson died as a result of being struck and/or strangled.
>      3. Mr. Pendleton acted with malice aforethought.
>      4. Mr. Pendleton either:
>      (a) acted willfully, deliberately, premeditatedly, and with a specific intent to kill Allen Henderson; or
>      (b) was participating in the offense of [r]obbery in the [f]irst or [s]econd [d]egree.

[9] Given the timing of his briefing, Pendleton's routing statement recommended the supreme court transfer this appeal to our court because another case pending before the supreme court would resolve those constitutional issues. But that decision, *State v. West Vangen*, filed in June 2022, did not resolve the constitutionality of section 814.28. 975 N.W.2d 344, 348–51 (Iowa 2022).

1. On or about the 2nd day of October 2019, Mr. Pendleton had the specific intent to commit a theft;

2. To carry out that intention or to assist him in escaping from the scene, with or without stolen property, Mr. Pendleton either:

a. Committed an assault as defined in Instruction No. 37 on Allen Henderson; or

b. Threatened Allen Henderson with, or purposely put Allen Henderson in fear of, immediate serious injury; and

3. While perpetrating the robbery, Mr. Pendleton:

a. Purposely inflicted or attempted to inflict a serous injury on Allen Henderson; or

b. Was armed with a dangerous weapon

Or the jury could find second-degree robbery if:

1. On or about the 2nd day of October 2019, Mr. Pendleton had the specific intent to commit a theft.

2. In carrying out his intention or to assist him in escaping from the scene, with or without the stolen property, Mr. Pendleton:

a. Committed an assault on Allen Henderson as defined in Instruction No. 37; or

b. Threatened Allen Henderson with, or purposely put Allen Henderson in fear of, immediate serious injury.

Pendleton claims the State offered insufficient proof that he intended to commit a theft. The jury did not receive a theft instruction, but our code provides "[a] person commits theft when the person . . . [t]akes possession or control of the property of another . . . with the intent to deprive the other thereof." Iowa Code § 714.1(1).

The property at issue is the pastor's cell phone. Pendleton claims he did not have a specific intent to take the phone because he "was acting in response to a delusion that Henderson was sexually abusing a child in church and was using the phone to record the abuse." In other words, Pendleton "took the phone because he believed it was evidence of the crime."

But even if Pendleton believed he was acting for righteous reasons, the jury could reasonably find he "[took] possession or control" of the phone "with the intent

to deprive" the pastor of the property.[10] Pendleton told Hedlund how he used the hemp belt to lure Henderson out of the building before attacking him. In his interview, Pendleton claimed that he seized the phone because he believed that Henderson was using it to record sex acts. Pendleton also told officers that when he tried to take the phone, Henderson "wouldn't give it up." Considering Pendleton's dubious motive, the jury could reasonably conclude his intent was to permanently deprive Henderson of his phone.

Pendleton also submits that if his "intent were to rob Henderson, certainly he would have taken . . . other valuables," including the pastor's gun, his wallet, and his cash—all of which were found on or near the body. But the State did not have to explain why Pendleton did not steal all items in Henderson's possession. It was enough that the State offered proof that Pendleton had the specific intent to deprive Henderson of the phone. The State proved beyond a reasonable doubt that Pendleton committed robbery and thus was "participating in" a forcible felony when he killed Henderson. Because both murder alternatives are supported, we need not delve into Pendleton's constitutional challenges to section 814.28. *See West Vangen*, 975 N.W.2d at 351.

## III. Conclusion

We find no grounds to suppress the challenged statements. And substantial evidence supports both the robbery verdict and the felony-murder theory for first-degree murder. Thus, we affirm Pendleton's convictions.

**AFFIRMED.**

---

[10] Section 714.1(1) "requires more than a temporary dispossessing of another's property." *State v. Berger*, 438 N.W.2d 29, 31 (Iowa Ct. App. 1989).