**STATE of Maine**

v.

**Theodore MIKULEWICZ.**

Supreme Judicial Court of Maine.

Argued June 7, 1983.

Decided July 14, 1983.

Charles K. Leadbetter, Herbert Bunker, Jr., Anita M. St. Onge (orally), Asst. Attys. Gen., Augusta, for plaintiff.

Burton G. Shiro Law Offices, Louis J. Shiro (orally), Waterville, for defendant.

Before McKUSICK, C.J., and GODFREY, NICHOLS, ROBERTS and VIOLETTE, JJ.

NICHOLS, Justice.

The central issue on this appeal is whether a confession which resulted from a long custodial interrogation during the course of which law enforcement personnel permitted the Defendant, Theodore Mikulewicz, to consume substantial quantities of alcohol was properly admitted into evidence at the Defendant's subsequent trial. We conclude that a confession produced under such circumstances is not voluntary and that its admission here violated the right of the Defendant to due process. Therefore, we sustain his appeal.

On the morning of Sunday, October 4, 1981, Donald Dahlstrom was discovered lying dead outside of his trailer off Route 43 in Starks. He had been killed by a single shotgun blast to the head.

The Somerset County Sheriff's Department and the Maine State Police investigated the death. At 4:10 P.M. that day, a deputy sheriff and a state trooper, both in uniform, arrived at the Defendant's camp on Brand Mill Road in Starks. They knocked on the door, and the Defendant called for them to come in. Once inside the camp, they identified themselves, explained that they were investigating Dahlstrom's death and asked the Defendant several questions.

The fifty-nine-year-old Defendant at this time was lying in the bottom bunk of a bunkbed, naked but for a pair of socks. The state trooper testified that he observed a half-gallon bottle of gin or vodka on the floor and that in his opinion the Defendant had been drinking.

After observing certain incriminatory evidence, this trooper radioed a state police sergeant. This sergeant and a state police corporal arrived at the camp at 4:30 P.M. Five minutes later the corporal read the Defendant the warnings to which he was entitled under the *Miranda* decision; these were the only such warnings he would re-

ceive during the long evening. The Defendant agreed to talk with the officers, and an interrogation ensued.

At 4:45 P.M. the corporal asked the Defendant if he knew what time it was; the Defendant responded that he thought it was about "noontime." The Defendant further told the officers that he did not feel well and that he preferred to remain in his prone position. Moreover, according to the trooper, some of the Defendant's answers to the officers' questions were "eccentric."

The interrogation continued through the evening, with the contingent of police officers bolstered by the subsequent arrival of two more state troopers. At times an assistant attorney general was also present.

At some point during the course of the evening the Defendant began drinking again. One of these state troopers, who was present at the camp from 6:00 P.M. to 12:30 A.M., testified that when he arrived the Defendant was "under the influence"; that through the evening the Defendant became "progressively intoxicated"; and that by 12:30 A.M., the time of the eventual arrest, the Defendant was "drunk." The same trooper explained at the trial how the Defendant was drinking vodka and V–8 juice:

> He was free pouring it, he wasn't pouring it in shot glasses, but I know out of the first bottle of vodka there was at least three inches in the bottom of it, and that bottle was a half gallon, and then he went and got another full bottle out of a case, and he brought that out and started drinking that, and I really don't recall

how much he had out of that, but probably three or four drinks.

At the trial, during the cross-examination of the corporal, the following colloquy took place:

[DEFENSE COUNSEL]: And would you state whether or not you had felt if Mr. Mikulewicz had had more and more to drink that he would be more and more loose with his tongue? Did that cross your mind?

[CORPORAL]: Would you repeat that question?

[DEFENSE COUNSEL]: If he had more and more to drink as you were there, that he would be more apt to perhaps be loose, give loose talk?

[CORPORAL]: Did I think that?

[DEFENSE COUNSEL]: Yes.

[CORPORAL]: Yes, I did.

Although the Defendant never "confessed" to killing Dahlstrom in the sense of an outright admission of guilt, he did nevertheless, during the course of the seven-hour interrogation, make several statements which were at least inferentially incriminatory.[1] At 12:30 A.M. the Defendant was formally arrested. The next day at Somerset County Jail, when once again read *Miranda* warnings, the Defendant responded by requesting an attorney.

Indicted for murder by a Somerset County grand jury, the Defendant filed various pre-trial suppression motions, one of which sought the suppression on voluntariness grounds of all statements he had made to the police on the long evening of the interrogation. After a testimonial hearing that motion was denied.[2]

---

1. The corporal testified at trial as to three statements made by the Defendant. The first involved an exchange with one of the troopers in which the Defendant asked "How did you know?" The trooper queried "How did I know what?" to which the Defendant responded "How did you know I knew the guy?"

The second statement by the Defendant was: "I have killed many. If they have a gun on me I'd shoot them."

The third statement, made by the Defendant in reference to the war, was: "It was kill or be killed."

2. Ruling from the bench, the court concluded that the Defendant was properly advised of his rights and knowingly waived them.

Although acknowledging the Defendant's consumption of alcohol, the court ruled that the Defendant's statements were voluntary.

Following a jury trial in Superior Court the Defendant was convicted of murder. Raising a number of issues, the Defendant took this appeal from that conviction. We need only consider the admissibility of the Defendant's confession.

■ The threshold question is the State's contention that the Defendant was not in custody at the time of interrogation. This argument fails on two grounds. First, it is abundantly clear that the Defendant, practically naked and alone in his rural home with one deputy sheriff, five state troopers and an assistant attorney general, was in custody. It is hard to imagine a more "police-dominated atmosphere," *State v. Inman,* 350 A.2d 582, 599 (Me.1976), than that pervading this small camp. There is absolutely no indication in the record that the Defendant, the prime suspect in this case, would have been free to leave had he so desired.[3]

■ Second, whether or not this was a custodial interrogation—while of crucial importance were the necessity of *Miranda* warnings at issue here—is simply not determinative of whether the Defendant's confession was voluntary. Custody is only one factor to be considered in determining the voluntariness of a confession; an involuntary confession does not become any less constitutionally infirm merely because it is tendered in a noncustodial setting.[4]

■ The requirement that the confession of an accused must be voluntary if it is to be admitted against him at trial is fundamental to the concept of due process of law. *Mincey v. Arizona,* 437 U.S. 385, 398, 98 S.Ct. 2408, 2416, 57 L.Ed.2d 290 (1978); *Ro-*

*chin v. California,* 342 U.S. 165, 173, 72 S.Ct. 205, 210, 96 L.Ed. 183 (1951). While deriving from a single constitutional guarantee, the voluntariness requirement gives effect to three overlapping but conceptually distinct values: (1) it discourages objectionable police practices; (2) it protects the mental freedom of the individual; and (3) it preserves a quality of fundamental fairness in the criminal justice system. *See* Grano, *Voluntariness, Free Will, and the Law of Confessions,* 65 Va.L.Rev. 859, 896–924 (1979).[5]

In part because the voluntariness requirement embodies such manifold concerns, articulating a uniform test of voluntariness has proven a difficult task. In *State v. Catlin,* we stated that:

the test with respect to the voluntariness of a confession 'is whether or not in any given case there has been under the totality of the circumstances fundamental fairness and governmental fair play on the part of the police dispelling any coercive effect from the sum total of the operating factors involved.'

392 A.2d 27, 30 (Me.1978) (quoting *State v. Smith,* 277 A.2d 481, 490 (Me.1971).

More recently, following the Supreme Court's decisions in *Mincey v. Arizona,* 437 U.S. at 398, 98 S.Ct. at 2416; *Townsend v. Sain,* 372 U.S. 293, 308–09, 83 S.Ct. 745, 754–55, 9 L.Ed.2d 770 (1963); and *Blackburn v. Alabama,* 361 U.S. 199, 208, 80 S.Ct. 274, 280, 4 L.Ed.2d 242 (1960), we held that "in order to find a statement voluntary, it must first be established that it is the result of defendant's exercise of his own free will

---

**3.** We find no merit in the State's suggestion that the Defendant's freedom to pour himself drinks evidences a noncustodial situation. We will not so readily infer a suspect's freedom to leave in light of the constabulary's interest in freeing his tongue.

**4.** Professor Kamisar's example of a policeman who dons clerical garb and takes a confession from a deceived penitent is a clear instance of a constitutionally involuntary noncustodial confession. *See* Kamisar, *What Is an Involuntary Confession?* 17 Rutgers L.Rev. 728, 747 (1963)

(cited in Sheldon, *The Obsolescence of Voluntary Confessions in Maine,* 35 Me.L.Rev. 243, 252 n. 49 (1983).

**5.** Another value arguably furthered by the voluntariness requirement, insuring the trustworthiness and reliability of confessions, was rejected by the Supreme Court in *Lego v. Twomey,* 404 U.S. 477, 484–85 & n. 12, 92 S.Ct. 619, 624–25 & n. 12, 30 L.Ed.2d 618 (1972). *See State v. Melvin,* 390 A.2d 1024, 1031 n. 3 (Me. 1978); *State v. Collins,* 297 A.2d at 634 n. 13.

and rational intellect." *State v. Caouette,* 446 A.2d 1120, 1123 (Me.1982).

◼ The requirements of *Catlin* and *Caouette* are complementary and can be restated as follows: A confession is voluntary if it results from the free choice of a rational mind, if it is not a product of coercive police conduct, and if under all of the circumstances its admission would be fundamentally fair.

◼ Applying this standard in the instant case, it is clear beyond question that the Defendant's statements to the police during the course of this long and most unusual interrogation were not voluntary and that their introduction at trial violated his right to due process of law under the Maine Constitution and the United States Constitution.[6] We conclude that because the officers involved permitted the Defendant to drink himself to a state of inebriation during the interrogation, expecting that this would "loosen his tongue," the Defendant's statements were not voluntary.

We see little distinction between the confession here and that condemned in *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), where the accused was injected with hyoscine, a drug having the effect of a truth serum, prior to the start of interrogation.[7] In *Townsend* there was at least an element of good faith on the part of the police in that the drug was administered for medical reasons and the officers conducting the interrogation were not aware of the drug's properties as a truth serum. *Id.* at 298, 308, 83 S.Ct. at 750, 754–55. No similar justification can be gleaned from the record in this case.

We would also note that the other circumstances of this interrogation only served to enhance its overall unfairness. The Defendant's age, his nakedness throughout the interrogation, the fact that he was lying in a bed and did not feel well, the length of the continuous interrogation, the number of officers involved, and the "tag-team" approach to questioning, when combined with the use of alcohol to encourage the Defendant to talk, comprise a sorry spectacle. The involvement of an assistant attorney general in such an episode is inexplicable.

Over a half-century ago, Justice Holmes wrote: "We have to choose, and for my part I think it a less evil that some criminals should escape than that the government should play an ignoble part." *Olmstead v. United States,* 277 U.S. 438, 470, 48 S.Ct. 564, 575, 72 L.Ed. 944 (1927) (Holmes, J., dissenting). We reaffirm that choice today.

The entry must be:

Appeal sustained.

Judgment of conviction vacated.

Remanded for further proceedings consistent with the opinion herein.

All concurring.

---

**6.** The Fourteenth Amendment provides that "nor shall any State deprive any person of life, liberty, or property, without due process of law ...," U.S. Const. amend. XIV, § 1, while the comparable Maine guarantee provides that "[n]o person shall be deprived of life, liberty or property without due process of law ...," Me. Const. art. I, § 6–A.

**7.** The Court stated: "It is difficult to imagine a situation in which a confession would be less the product of a free intellect, less voluntary than when brought about by a drug having the effect of a truth serum." *Id.* at 307–08, 83 S.Ct. at 754. *See also Beecher v. Alabama,* 408 U.S. 234, 237, 92 S.Ct. 2282, 2283, 33 L.Ed.2d 317 (1972) (per curiam) (confession made after accused was injected with morphine due to gunshot wound held product of "gross coercion" and involuntary).