**STATE of Iowa, Plaintiff–Appellee,**

v.

**Bennie PIERSON, Jr., Defendant–Appellant.**

No. 95–0670.

Court of Appeals of Iowa.

May 31, 1996.

Maggi Moss of Parrish, Kruidenier, Moss, Dunn, Montgomery & Thomas, Des Moines, for appellant.

Thomas J. Miller, Attorney General, Mary Tabor, Assistant Attorney General, Denver D. Dillard, County Attorney, and Harold Denton, Assistant County Attorney, for appellee.

Heard by HABHAB, P.J., HUITINK, J., and McCARTNEY, Senior Judge.*

HABHAB, Presiding Justice.

Bennie Pierson, Jr., was charged with the murder of Michael Heiderscheit. Heiderscheit had died from severe blows to the head and was found at the Roller Dam in Cedar Rapids.

At Pierson's jury trial, the State presented the following evidence. On September 15, Pierson came across his long-time acquaintance, Heiderscheit, at the Taco Kid restaurant in Cedar Rapids. Heiderscheit was an employee at Taco Kid and was there picking up his paycheck. Pierson accompanied Heiderscheit to the Hy–Vee grocery store near Lindale Mall on Collins Road where Heiderscheit cashed his paycheck and the men bought some beer. From the Hy–Vee, the men went to Heiderscheit's apartment where they met Lawrence Duenas and Duenas' daughter. After drinking beer and talking with Duenas, Pierson and Heiderscheit left Heiderscheit's apartment to go to several bars.

* Senior judge from the Second Judicial District serving on this court by order of the Iowa Supreme Court.

The last bar they visited was Bully's on F Avenue in Cedar Rapids. Heiderscheit paid for all the drinks with his paycheck money. Heiderscheit had a Cedar Rapids Gazette newspaper route to deliver the following morning, so Pierson left Bully's to give Heiderscheit a ride home. The State presented testimony of a patron at Bully's that Pierson stated, before leaving Bully's, he was going to take Heiderscheit to the Roller Dam and beat him up. Pierson returned to Bully's later that same night. The State also presented evidence that, on his return to Bully's, Pierson had a small amount of blood on his hand, he was showing off a wallet and a wad of money, and he told two friends he hit Heiderscheit.

On September 17, Pierson went to the police station to volunteer information about Heiderscheit.[1] Pierson talked to Officer Mark Andries and stated he had overheard two males at Bully's say they intended to take Heiderscheit to the Roller Dam, rob him, and kill him. At that time, the murder had not yet been discovered. Officer Andries thanked Pierson for his information and sent Pierson home.

Heiderscheit's body was found at the Roller Dam by Leon Martin and his son on September 18. Heiderscheit had been badly beaten and died of massive head injuries. Detective Richard Hamblin was assigned to help investigate the crime. Detective Hamblin was told Pierson might have some information since he was one of the last people to see Heiderscheit. Detective Hamblin went to Pierson's home to talk to him and did not find him there. On his arrival back at the police station, Detective Hamblin was told Pierson was at the police station and wanted to talk. Detective Hamblin told Pierson he was investigating Heiderscheit's disappearance and he understood Pierson had some information which might be of help. Around 5:30 or 5:45 p.m., Detective Hamblin took Pierson to an interview room to begin the interview.

Pierson told Detective Hamblin about meeting Heiderscheit at Taco Kid, going to

Hy–Vee, drinking at Heiderscheit's apartment, and then going to bars including Bully's. Pierson then told the detective he dropped Heiderscheit off at his apartment and proceeded to a Texaco gas station on the southwest side of Cedar Rapids near Hawkeye Downs. From the Texaco station, Pierson then went to Checker's, another bar in Cedar Rapids. While at Checker's, Pierson became sick and vomited in the bathroom. Pierson told Detective Hamblin this was unusual because he never got sick while drinking beer. Pierson said he got sick because his insides were turning over because he knew he had done something bad. Pierson also related his whereabouts after the night of September 15.

At about 8:30 p.m., Detective Hamblin spoke with colleagues and concluded Pierson was a murder suspect. Pierson was then given a *Miranda* warning and signed a *Miranda* waiver form. Pierson was then interviewed until approximately 1:45 a.m. Pierson signed a statement relating his story of the events which occurred on the night of September 15. The statement included the following:

> I took Mike home and then about that time everything went blank. In my head, I remember hitting him in the face but don't remember anything else until I was at the Texaco station by Hawkeye Downs. I got a quart of beer that I left in my car and did not drink it and then I went to Checker's but I felt bad and went to the bathroom and threw up.

In the statement, Pierson stated he woke up the next morning still feeling like he had done something wrong, but he did not know what it was.

Pierson was found guilty of second-degree murder and sentenced to a fifty-year prison term.

Pierson appeals.

**I. *Sufficiency of the Evidence.*** Pierson contends there was insufficient evidence to convict him of second-degree murder. The

---

1. Pierson's girlfriend, Melissa Fellendorf, testified Pierson found her on September 17 and told her something horrible had happened. He told Fellendorf he had to go to the police. Fellendorf then accompanied Pierson to the police station.

standard of review is for errors at law. *State v. Phams,* 342 N.W.2d 792, 795 (Iowa 1983).

A jury's guilty verdict is binding upon us unless we conclude the record lacks substantial evidence to support such a finding. *State v. Bush,* 518 N.W.2d 778, 779 (Iowa 1994). Substantial evidence means such evidence as could convince a rational trier of fact the defendant is guilty of the crime charged beyond a reasonable doubt. *State v. Taft,* 506 N.W.2d 757, 762 (Iowa 1993). Substantial evidence does not, however, denote some elevated quantity of proof. *State v. Anderson,* 517 N.W.2d 208, 211 (Iowa 1994). Rather, the relevant question in our review of the case "is whether, after viewing all the evidence in the light most favorable to the prosecution, any rational trier of facts could have found the essential elements of the crime beyond a reasonable doubt." *Id.*

The evidence is viewed in the light most favorable to the State, including legitimate inferences and presumptions which may fairly and reasonably be deduced from the record. *State v. Bass,* 349 N.W.2d 498, 500 (Iowa 1984). Circumstantial evidence is just as probative as direct evidence. *State v. Parrish,* 502 N.W.2d 1, 3 (Iowa 1993); *State v. Garr,* 461 N.W.2d 171, 173 (Iowa 1990). We consider all the evidence at trial, not just the evidence that supports the verdict. *State v. Liggins,* 524 N.W.2d 181, 186 (Iowa 1994). A verdict is binding unless the finding is clearly against the weight of the evidence. *State v. Schrier,* 300 N.W.2d 305, 306 (Iowa 1981).

■ In finding Pierson guilty of second-degree murder, the jury found the State satisfied the following elements:

(1) On or about the 15th day of September, 1994, the defendant struck Michael Heiderscheit on the head.

(2) Michael Heiderscheit died as a result of being struck on the head.

(3) Defendant acted with malice aforethought.

Iowa Code §§ 707.1, 707.3 (1993). Pierson argues the State's case relied heavily on the testimony given by Jason Bartels and Robert Gandy and these witnesses gave inconsistent and contradictory testimony. Pierson contends Bartels' and Gandy's testimony would not be given any weight by any reasonable-minded juror and without this testimony there was insufficient evidence to find Pierson guilty. Pierson also challenges the sufficiency of the evidence based on the failure of the State to show defendant carried any significant blood stains following the beating of Heiderscheit, despite blood being splattered at the scene of the crime.

The jury is in the best position to assess credibility. *State v. Knox,* 536 N.W.2d 735, 742 (Iowa 1995); *State v. Hulbert,* 481 N.W.2d 329, 332 (Iowa 1992). It is the jury's duty to sort out the credibility of witnesses and place credibility where it belongs. *State v. Schertz,* 328 N.W.2d 320, 322 (Iowa 1982); *State v. McCullough,* 226 N.W.2d 216, 217 (Iowa 1975); *State v. Hawkins,* 519 N.W.2d 103, 104 (Iowa App.1994); *State v. Trammell,* 458 N.W.2d 862, 863 (Iowa App.1990). The jury may believe or disbelieve the testimony of witnesses as it chooses. *State v. Blair,* 347 N.W.2d 416, 421 (Iowa 1984); *Hawkins,* 519 N.W.2d at 104. It is the jury's duty to assign the evidence presented whatever weight it deemed proper. *Knox,* 536 N.W.2d at 742; *State v. Simpson,* 528 N.W.2d 627, 632 (Iowa 1995); *Liggins,* 524 N.W.2d at 186.

We do not agree the testimony of Bartels and Gandy was totally discredited by the defense in cross-examination. While they did have trouble remembering certain aspects of the night in question, they gave testimony a finder of fact could find credible regarding what Pierson said and did at Bully's on the night of September 15. Further, as we view the evidence, there are reasonable inferences which allow the finder of fact to find Pierson guilty regardless of the amount of evidence the State presented concerning blood found on Pierson. We find there was substantial evidence to support Pierson's conviction of second-degree murder.

■ II. *Motion to Suppress.* Pierson contends the district court erred in denying his motion to suppress the statement he signed at the police station at the conclusion of the interview with Detective Hamblin. Pierson argues his *Miranda* rights were violated and his confession was involuntary. A claim involving a constitutional right requires

us to make an independent evaluation of the totality of the relevant circumstances to determine if such an error was made. *Rinehart v. State,* 234 N.W.2d 649, 658 (Iowa 1975).

▮ The Fifth and Fourteenth Amendments protect a person's right against self-incrimination. *Malloy v. Hogan,* 378 U.S. 1, 3, 84 S.Ct. 1489, 1492, 12 L.Ed.2d 653, 658 (1964). Since *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), we have a dual test in determining the admissibility of inculpatory statements by a criminal defendant. *State v. Davis,* 446 N.W.2d 785, 788 (Iowa 1989). "First, we ascertain whether or not *Miranda* warnings are required and, if so, whether they were properly given. Second, we determine whether the statement is voluntary and satisfies due process." *Id.*

▮ In *Miranda,* the Supreme Court mandated that during custodial interrogation an accused be advised of certain constitutional rights. *Miranda,* 384 U.S. at 444–45, 86 S.Ct. at 1612, 16 L.Ed.2d at 706–07. A defendant may waive these rights, however, provided the waiver was made voluntarily, knowingly, and intelligently. *Id.*

▮ A *Miranda* inquiry is not triggered unless there are both custody and interrogation. *Id.; Davis,* 446 N.W.2d at 788. Custodial interrogation has been defined as the "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom in any way." *Davis,* 446 N.W.2d at 788 (quoting *Miranda,* 384 U.S. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706).

▮ Custodial interrogation is questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom in any way. *Davis,* 446 N.W.2d at 788. The ultimate inquiry is whether there is an arrest or a restraint on freedom of movement of a degree associated with an arrest. *Id.* However, the mere fact an individual is questioned at a law enforcement center does not render the interview a custodial interrogation. *See State v. Schwartz,* 467 N.W.2d 240, 245 (Iowa 1991). The United States Supreme Court has stated:

[P]olice officers are not required to administer Miranda warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. Miranda warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody."

*Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714, 719 (1977).

▮ While police wanted to talk to Pierson after Heiderscheit's body was found, it appears from the record that Pierson showed up voluntarily at the police station. Detective Hamblin testified at the suppression hearing that at the time Pierson showed up at the police station, Pierson was not a suspect; rather, the police felt he might have some valuable information since he spent a great deal of time with Heiderscheit on September 15. As Detective Hamblin did not view Pierson as a suspect initially, Detective Hamblin stated Pierson would certainly have been free to leave if Pierson had asked to leave. The door to the interview room was unlocked during the interview. We find there was not a custodial interrogation requiring a *Miranda* warning during the initial part of the interview on September 18.

▮ This situation changed, however, after Detective Hamblin talked to other detectives working on the case during a break in the interview around 8:30 p.m. His associates indicated there was information on the case which implicated Pierson as a suspect. Upon learning Pierson was a suspect, Detective Hamblin gave Pierson his *Miranda* rights. Pierson signed a written waiver of his *Miranda* rights. "An express written waiver is 'usually strong proof of the validity of that waiver.'" *Fryer v. State,* 325 N.W.2d 400, 409 (Iowa 1982) (quoting *North Carolina v. Butler,* 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286, 292 (1979)).

▮ A written waiver alone, however, is not sufficient to establish waiver; rather, we must determine whether the waiver was voluntarily, knowingly, and intelligently made.

*Id.* Detective Hamblin testified at the suppression hearing that he asked Pierson to read the waiver and asked him if he understood it. Pierson responded he did. Detective Hamblin stated he and Pierson went through the waiver very carefully, paragraph by paragraph. We find Pierson voluntarily, knowingly, and intelligently waived his *Miranda* rights.

■ Our second inquiry addresses the issue of voluntariness. *See Davis,* 446 N.W.2d at 788 (noting the difference between voluntary waivers of *Miranda* rights and voluntary statements). Even though we have found Pierson waived his *Miranda* rights, the State must still prove by a preponderance of the evidence the accused's subsequent incriminatory statements were voluntarily given. *Id.; see also State v. Davidson,* 340 N.W.2d 770, 771 (Iowa 1983).

■ Statements are deemed voluntary if they were the "product of an essentially free and unconstrained choice, made by the defendant at a time when his will was not overborne nor his capacity for self-determination critically impaired." *State v. Hodges,* 326 N.W.2d 345, 347 (Iowa 1982) (quoting *State v. Snethen,* 245 N.W.2d 308, 315 (Iowa 1976)). In ruling on the voluntariness inquiry, this court examines the totality of the circumstances. *State v. Cullison,* 227 N.W.2d 121, 127 (Iowa 1975).

■ Many factors bear on the issue of voluntariness, including defendant's age, experience, prior record, level of education and intelligence; the length of time the defendant is interrogated; whether physical punishment was used; defendant's ability to understand the questions; defendant's physical and emotional condition; whether any deceit or improper promises were used in gaining the admission; and any mental weakness defendant may possess. *Hodges,* 326 N.W.2d at 348.

■ Before we discuss the circumstances surrounding the interrogation in this case, it is important to note that no one factor is determinative of the voluntariness of an admission.[2] *Davis,* 446 N.W.2d at 789. The circumstance we find most disturbing in this interrogation is the length of time Pierson spent being questioned by Detective Hamblin. From the time Pierson arrived at the police station until the time he was taken to the county jail, approximately eight to eight-and-one-half hours elapsed. We find this to be a long time, particularly in light of the fact Pierson's story did not change much during the course of the interview. One substantial change in his story did occur, however, late in the interrogation when Pierson admitted to hitting Heiderscheit in the face. While we find the length of the interrogation was probably unduly long given the circumstances, we find this factor in isolation does not render the incriminating statements made by Pierson during the interrogation involuntary.

We come to our conclusion regarding the voluntariness of the incriminating statements through an examination of the totality of the circumstances. At the time of the interview, Detective Hamblin knew Pierson was an alcoholic, but he did not feel Pierson was impaired by alcohol at the time. Pierson was twenty-four years old at the time and had attended junior college. His behavior during the interview suggests he had an understanding of the criminal justice system and the situation he was in.[3] During the interroga-

2. An excellent example of an examination of the cumulative effect of a number of factors in determining whether a confession is voluntary is presented in *State v. Mikulewicz,* 462 A.2d 497 (Me. 1983). The court in *Mikulewicz* found a confession to be involuntary and characterized the surrounding circumstances as follows:

> We would also note that the other circumstances of this interrogation only served to enhance its overall unfairness. The Defendant's age, his nakedness throughout the interrogation, the fact that he was lying in a bed and did not feel well, the length of the

continuous interrogation, the number of officers involved, and the "tag-team" approach to questioning, when combined with the use of alcohol to encourage the Defendant to talk, comprise a sorry spectacle.

*State v. Mikulewicz,* 462 A.2d 497, 501 (Me. 1983).

3. Around midnight during the interrogation, Pierson asked to speak with a friend, Sheriff's Deputy Barry Brandt. Brandt was called down to the police station where he spoke with Pierson and was present during the questioning. Brandt and Pierson discussed whether Pierson wanted

tion, Pierson was given frequent breaks and refreshments. There are no allegations of physical punishment, nor are there allegations of deceit or improper promises. We are unable to find any evidence of intimidation on the part of Detective Hamblin. We find Pierson made an essentially free and unconstrained choice at a time when his will was not overborne nor his capacity for self-determination critically impaired. While we do not approve of the length of the interrogation under the circumstances of this case, we nevertheless find, after examining the totality of the circumstances, the incriminating statements were voluntary. Consequently, the district court did not err in denying the motion to suppress.

■ **III.** *Ineffective Assistance of Counsel.* Pierson contends he was denied effective assistance of counsel. Specifically, Pierson argues his counsel provided ineffective assistance by failing to (1) adequately consult with Pierson in preparation for the trial, and (2) object to leading questions asked by the State. In reviewing claims of ineffective assistance of counsel, we review de novo the totality of relevant circumstances. *State v. Risdal,* 404 N.W.2d 130, 131 (Iowa 1987). The burden of proof in such claims rests with the defendant. *Taylor v. State,* 352 N.W.2d 683, 685 (Iowa 1984).

A claim of ineffective assistance of counsel requires a showing that: (1) counsel's performance fell outside the normal range of competency; and (2) the deficient performance so prejudiced the defendant as to give rise to a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different. *State v. McKettrick,* 480 N.W.2d 52, 55 (Iowa 1992). In order to meet the first prong, defendant must overcome the strong presumption that counsel's actions were reasonable under the circumstances and fell within the normal range of competency. *State v. Buck,* 510 N.W.2d 850, 853 (Iowa 1994). To succeed on the second prong, the defendant must show that counsel's failure worked to the defendant's actual and substantial disadvantage so that, but for counsel's error, the result of the proceeding would have been different. *Id.*

an attorney. Pierson decided he still did not

■ Claims of ineffective assistance of counsel are usually not adjudicated on direct appeal because the attorney charged with ineffectiveness has not had an opportunity to respond to the allegations. *McKettrick,* 480 N.W.2d at 56. Such claims may be decided on direct appeal, however, if the defendant fails to show one of the two prongs. *State v. Walker,* 538 N.W.2d 316, 322 (Iowa App. 1995); *State v. O'Donnell,* 533 N.W.2d 576, 579 (Iowa App.1995).

■ Pierson's first claim is his counsel failed to provide effective assistance of counsel in the pre-trial preparation. Pierson argues counsel "failed to: (1) interview witnesses that were relevant to Defendant's defense, (2) return phone calls or meet with Defendant, and (3) allow Defendant copies or review depositions and police reports with Defendant." In making claims of ineffective assistance of counsel, defendant "must state the specific ways in which counsel's performance was inadequate and identify how competent representation probably would have changed the outcome." *Dunbar v. State,* 515 N.W.2d 12, 15 (Iowa 1994). A failure to meet this burden will result in the denial of a claim of ineffective assistance of counsel. *Id.* We find Pierson has failed to be specific in presenting his claim of ineffective assistance of counsel and consequently his claim regarding pre-trial preparation must be denied on direct appeal.

■ Pierson's second claim is his counsel failed to make objections to three questions Pierson classifies as leading and suggestive. These questions took place during the examination of Jason Bartels and Robert Gandy. In order to make a complete analysis of the claim, we have reviewed the questions at issue in the context in which they were asked. We find defense counsel did not fail to perform an essential duty in failing to object to the questions. While the questions were all leading, objections to these questions would most likely have not succeeded. The questions were either proper attempts to impeach statements made by the witness during his testimony or proper questions to a

want one.

witness identified with defendant. *See* Iowa R.Evid. 607, 611. Also, counsel need not make every possible evidentiary objection to satisfy the standard of normal competency. *State v. Carberry,* 501 N.W.2d 473, 477 (Iowa 1993). We conclude this claim of ineffective assistance of counsel must also fail.

Accordingly, we affirm the conviction of Bennie Pierson, Jr. of murder in the second degree.

**AFFIRMED.**

VOGEL, J., takes no part.