STATE OF MAINE                 UNIFIED CRIMINAL COURT
KENNEBEC, SS.                  AUGUSTA
                              DOCKET NOS. CR-2018-02481 & 21277


STATE OF MAINE

V.                            **ORDER ON MOTION TO SUPPRESS**

ROBERT A. PERKINS


## INTRODUCTION

The matter before the court is the Defendant's (Perkins) motion to suppress any and all statement he made to law enforcement officers in recorded interviews conducted on June 5, 2018 and November 29, 2018. He also seeks to suppress any tangible evidence seized as a result of those statements as "fruit of the poisonous tree." The court held an evidentiary hearing on August 5, 2019, at which it received the testimony of Maine State Police Detective Scott Quintero. The court also admitted into evidence, without objection, Joint Exhibits 1-3. Exhibit 3 is a thumb drive provided to the court by Defense Counsel, which contains both recorded interviews. Exhibits 1 and 2 are the transcriptions of the interviews.

The court has listened to the complete recordings of both interviews, with the assistance of the transcripts as an aid. In this regard, the court found the written transcripts to be quite helpful while listening to the actual recordings. Nevertheless, not surprisingly the transcripts did contain the occasional typographical error, and the court is aware that it is the recordings themselves that constitute evidence, not the transcripts.

Based upon the evidence presented at the hearing, including the testimony of Det. Quintero and the recorded interviews, the court makes the following findings of fact.

## FACTS

On June 8, 2018, Detectives Quintero and Sarah Ferland of the Maine State Police arrived at the home of Mr. Perkins and his wife Jessica. Perkins answered the knock on the door. At that time, apparently, Perkins was the only one home, although Jessica would arrive home somewhat later. Det. Quintero identified himself and asked Perkins: "Can I talk to you for a minute, bud?" Perkins said: "Yeah," and accompanied Quintero to his cruiser, where he was introduced to Det. Ferland. Quintero sat in the driver's seat; Perkins sat in the front passenger seat, and Ferland sat in the rear.

Almost immediately, Quintero told Perkins: "If you don't feel that you want to talk to me, that's the door, do you see where the handle [is] right there." Perkins told Quintero: "I know how to work it." Quintero emphasized: "You go ahead and do that whenever you want."

Quintero spoke in general terms for a few minutes and then asked Perkins if he had any idea as to why the State Police were there wanting to talk with him. Perkins replied: "I've got no clue." Quintero eventually told Perkins that allegations had been made against him. Perkins indicated that allegations had been made against him in the past that he thought had been resolved.[1] Quintero repeatedly and persistently encouraged Perkins to be truthful and he also emphasized his (Quintero's) ability to tell when Perkins was not being truthful.

---

[1] Perkins referred to the fact that no young children were allowed to be at his residence and that this requirement was self-imposed by he and his wife after earlier allegations of misconduct had been raised.

Gradually, during the course of the interview, which lasted slightly more than 2 ½ hours, Perkins made a number of incriminating statements and admissions regarding inappropriate sexual conduct with young female children and one teenage male. With respect to the male accuser, Perkins adamantly refused to agree with Quintero's assertion that he (Perkins) was being untruthful as to the full extent of the sexual contact.

The interview followed a pattern. Quintero strongly urged Perkins to tell the truth and get the secrets out and lift the weight off his shoulders; Perkins initially denied that anything inappropriate happened; Quintero told Perkins that he knew he was lying and that more had happened that Perkins was concealing; Perkins eventually admitted more and more as Quintero pressed him on being totally honest.

Quintero then brought up another accuser's name and the same pattern was followed, i.e., denial; challenge to tell the truth; more denial; further challenge that he (Perkins) was lying; gradual admission to more detailed information about the inappropriate sexual behavior.

Relatively early on in the interview, the Defendant's wife came home. Later it was learned that she was injuring herself by "cutting" her arm and face. The detective called 9-1-1 and had ambulance personnel come to the Perkins residence to provide medical treatment to her.

During this interview, as Quintero was trying to persuade or "cajole" Perkins to be fully honest with him, the detective told Perkins that he did not know what would happen in the case. One of the factors, however, was whether the suspect had lied or was truthful. By way of example: ". . . what I don't know and what will determine how things go from here is what you tell me, okay?" *Exhibit 1 at 10*. ". . . the court process can get going right out of the gate, or it may not go at all." *Id. at 11*. "We haven't even decided what action we're going to take right now, all right, because there may be explanations, you know?" *Id at 12*. ". . . I'm giving you an

opportunity to explain to me the why it happened and how it happened because it may make a total world of difference . . . ." *Id. at 17*. ". . . but right now is an opportunity for you to talk to me and maybe we can head this off at the pass."[2] *Id.* "I'm going to give you this life line before I run out of rope with you." *Id. at 19*. "There's a window here." *Id.* "You, though, are the final piece which dictates which way the wind blows; do we pursue this further?" *Id. at 92*.

As the interview of June 5, 2018 was winding down, Quintero and Ferland asked Perkins for his consent for them to take his personal computer to examine it for child pornography. While concerned about how long he would be without his computer, Perkins eventually agreed to have the detectives take it.

Throughout the interview, Quintero told Perkins on many occasions that he was free to leave and that if he did not want to talk he could just go. *See Exhibit 1 at 3, 12, 23, 45, 46, 52, 53, 54, 55, 63, 72, 75, 90, 91, 92, 93, 97, 99*. No *Miranda* warnings/rights were given to Perkins during the June 5, 2018 interview.

Quintero and Ferland returned to speak with Perkins again on November 29, 2018. This interview lasted approximately 2 hours and 40 minutes, at the end of which Perkins was arrested. This interview began with Quintero asking Perkins: "Can we talk a little bit?" Perkins said: "Yeah." The interview was conducted in Quintero's cruiser again. Within minutes, Quintero told Perkins: "I'm telling you right now you're not under arrest." A few moments later, Quintero said: ". . . I want to be fair to you. I'll read you – I'm going to tell you Miranda rights, okay?" Immediately thereafter, Quintero added: "You're not under arrest or anything like that." In reciting the *Miranda* rights/warnings, the following colloquy took place:

---

[2] The transcript reads: "maybe we can head this off with a pass." *Id. at 17*. After listening to the actual recording, the court is satisfied that this transcription is not accurate. What Quintero said was "maybe we can head this off at the pass."

4

DETECTIVE QUINTERO: You have the right to remain silent. Do you understand that?

MR. PERKINS: Yeah. I know all of them.

DETECTIVE QUINTERO: You do?

MR. PERKINS: Uh-huh.

DETECTIVE QUINTERO: Yeah. We talked about that before, didn't we?

MR. PERKINS: Uh-huh.

DETECTIVE QUINTERO: Anyway, I'll go over them again. You got a right to remain silent. Anything you say can and will be used against you in a court of law.

MR. PERKINS: Uh-huh.

DETECTIVE PERKINS: You have the right to an attorney. If you can't afford an attorney, the court will appoint one for you.

MR. PERKINS: Uh-huh.

DETECTIVE QUINTERO: You have the right to stop answering questions now or at any time until you talk to an attorney and have an attorney present with you during questioning.

MR. PERKINS: Okay.

DETECTIVE QUINTERO: You understand all that?

MR. PERKINS: Uh-huh.

DETECTIVE QUINTERO: What does that mean to you, basically? We're going to talk voluntary? Is that - -

MR. PERKINS: Yeah.

*Exhibit 2 at 6-7.*

This second interview followed the same pattern as the first one. A short time into the interview, Quintero brought up the subject of the teenage male who had made accusations against Perkins and who was discussed during the interview of June 5, 2018. When the name of that teenager was mentioned, Perkins said: "I will be honest. I truly don't remember." *Exhibit 2 at 17.* Quintero was not buying it and said: "I know you remember." *Id.* When Perkins hesitated and started to say: "I'm -- I'm trying to –" the following exchange took place:

DETECTIVE QUINTERO: Do you want me to help you with that?

MR. PERKINS: Yeah, I actually would.

DETECTIVE QUINTERO: The thing that happened that we need to talk about is that – the occasion in which you touched his penis.

MR. PERKINS: Which was when? I never touched his penis.

DETECTIVE QUINTERO: No, no. No, no, no.

MR. PERKINS: NOT –

DETECTIVE QUINTERO: If you don't remember, you already told me last time you touched his penis, okay? So it just was in a little more detail. I've had many, many meetings on this, bud, all right? So at one point, you end up going down on [him].

MR. PERKINS: What do you mean by going down?

DETECTIVE QUINTERO: Sucking on his dick.

MR. PERKINS: No.

DETECTIVE QUINTERO: Yes.

MR. PERKINS: No, no. I don't care – no, no. I will contact a lawyer. I have never even seen the kid's dick, never, never. He has never dropped his pants in front of me. I don't know how you're saying that

6

you know he is telling the truth, okay, I really don't. Especially seeing as he told you, number one, that I was showing him gay porn on my computer. Did you guys find gay porn on my computer?

DETECTIVE QUINTERO: Calm down. Calm down for a second. Have I been straight up and fair with you?

MR. PERKINS: Yes, but what I want to know is how –
*Exhibit 2 at 18-19.*

Quintero and Perkins continued to talk (with Quintero doing most of the talking), for the next 10 to 11 minutes. They continued to disagree on this issue, with Quintero insisting that he knew what had happened and that Perkins was not being honest, while Perkins just as strongly insisted that what Quintero and the teenager were saying was absolutely false. The recording, of course, allows the court to hear the tone and inflection of Perkins' voice. Eventually, however, Perkins acknowledged that he did touch the teenager's penis by sliding his hand down the boy's pants. *Exhibit 2 at 28-29.*

Quintero told Perkins: ". . . it went further." Perkins insisted that no oral sex was involved. *Exhibit 2 at 30-31.* This back and forth discussion continued for another 18 minutes or so, until Perkins admitted that he did perform oral sex on the teenage boy, at first saying just once, but later saying it occurred a "[c]ouple of times." *Exhibit 2 at 44.*

About 5 minutes later, Quintero turned to the subject of Perkins and his wife engaging in inappropriate sexual behavior with the teenager. *Exhibit 2 at 48.* Perkins again adamantly denied that such a thing had ever happened. At one point, Perkins said: "I'll leave now," to which Quintero replied: "You can leave if you want." Perkins said: "I will, because it's – I've given you as much truth as – more truth than –" *Exhibit 2 at 50.* Quintero pointed out that Perkins had lied just minutes earlier, but Perkins continued to deny that his wife was a part to anything to do with

the teenager. Perkins, however, did not get out of the cruiser and there is no indication from the recording that he tried to.

Again, the discussion continued for another 4 or 5 minutes when Perkins said: "There's nothing more that I can say as far as anything that ever happened between me, Jess, and [the teenage boy] because nothing ever did. And at this point, I'll get out and leave." Quintero responded: "Okay. I don't want that to happen, but you can leave if you want to." *Exhibit 2 at 56*. The two men continued to talk, however, and Perkins did not leave the cruiser and end the conversation.

Soon thereafter, Quintero turned to another alleged victim and asked Perkins about her. Again, Quintero claimed that there was more to what happened than what Perkins was admitting. Perkins said: "It's okay. I'll sit here and lie to you." Quintero said: "I'd rather you get out than lie to me." *Exhibit 2 at 64*. He repeated that statement moments later. *Id. at 65*.

Quintero and Perkins continued to talk for another 50 minutes or so until they got out of the cruiser. It is unclear to the court whether Det. Ferland was in the rear of the cruiser as she had been on June 5, 2018, and if so for how long, but it does seem that she was not in the cruiser when Quintero and Perkins got out of it after about 2 hours. *Exhibit 2 at 113*. Also, the transcript and the recording of the interview on November 29, 2018 indicate that the Defendant's wife was again hurting herself by "cutting" and rescue personnel were called again on this occasion. *Exhibit 2 at 27*.

A few minutes after getting out of the cruiser, Det. Ferland informed Perkins that he was under arrest "at this point." *Exhibit 2 at 115*. Shortly thereafter, the three of them got back into the cruiser for the ride to the Kennebec County Jail. *Id. at 118*. A few minutes after that, Quintero recited the *Miranda* warnings/rights to Perkins:

8

DETECTIVE QUINTERO: I told you at the outset, but I'll tell you again, and now that you're under arrest, you have the right to remain silent. Anything you say can and will be used –

MR. PERKINS: Yeah.

DETECTIVE QUINTERO: -- against you in a court of law. You have the right to an attorney. If you can't afford an attorney, the court will appoint one for you. You have the right to stop answering questions at any time or stop answering until you can talk to an attorney or have an attorney present with you during questioning. I know you said you've heard those before, but you heard them again. You understand them?

MR. PERKINS: Yep.

DETECTIVE QUINTERO: Okay.

MR. PERKINS: So what did they tell Jess?

*Exhibit 2 at 120.*

Quintero, Ferland and Perkins conversed about Jessica and what she knew or did not know about what Perkins had allegedly done with underage children. Ultimately, however, Quintero returned to the topic of "what happened with Jess." *Exhibit 2 at 130.* This prompted Perkins to state: "And I keep telling you nothing ever happened between me, [the teenage boy], and Jess." *Id.* Perkins remained adamant on this subject. Quintero said: "But, Bobby, he's – you were having a form of gay sex with him at that time, so --." Perkins then said: "No. I lied to you because I was not – and I was just fed up with you forcing me, saying that he was – that he's not lying because he don't lie, or whatever the hell you were saying. I was fed up, and I said fine, it happened." *Exhibit 2 at 132.* Perkins continued to angrily insist that his wife was not involved in any sexual way with the teenager until Quintero agreed to drop the subject. *Exhibit 2 at 133-134.* Finally, they arrived at the jail.

Additional factual findings will be made, as necessary, in the Discussion section of this Order.

## DISCUSSION

Perkins seeks to suppress his statements of June 5 and November 29, 2018, on a number of different grounds, which the court will now address.

### A. Was the Defendant Subjected to Custodial Interrogation on June 5, 2018?

In *State v. Hopkins*, 2018 ME 100, ¶ 36, 189 A.3d 741, the Law Court reaffirmed its long-standing analysis of claims that a suspect was subjected to custodial interrogation. Quoting *State v. Perry*, 2017 ME 74, ¶ 15, 159 A.3d 840, the Court stated: "When a person has been subjected to an in-custody interrogation but has not been advised of his *Miranda* rights, the State may not offer the statements made during that interrogation against that person in its case-in-chief."

"In order for statements made prior to a *Miranda* warning to be admissible, the State must prove by a preponderance of the evidence, that the statements were made while the person was not in custody, or was not subject to interrogation." *State v. Bragg,* 2012 ME. 102, ¶ 8, 48 A.3d 769 *quoting State v. Bridges,* 2003 ME. 103, ¶ 23, 829 A.2d 247. *See also State v. Poblete,* 2010 ME. 37, ¶ 21, 993 A.2d 1104.

The Law Court has stated that the "ultimate inquiry" regarding whether someone is in custody for *Miranda* purposes "is whether a reasonable person in the shoes of [Perkins] would have felt he or she was not at liberty to terminate the interrogation and leave or if there was a restraint on freedom of movement of the degree associated with a formal arrest." *State v. Prescott,* 2012 ME. 96, ¶ 10, 48 A.3d218 *quoting State v. Poblete,* 2010 ME. 37, ¶ 22, 993 A.3d 1104.

The test is "purely objective" and a variety of factors must be considered in their "totality, not in isolation." *State v. Prescott,* 2012 ME. 96, ¶ 11; *State v. Dion,* 2007 ME. 87, ¶ 23, 928 A.2d 746. The Law Court has consistently identified the

following, non-exhaustive list of factors that are to be considered on the custody issue:

(1) the locale where the defendant made the statements;

(2) the party who initiated the contact;

(3) the existence or non-existence of probable cause to arrest (to the extent communicated to the defendant);

(4) subjective views, beliefs or intent that the police manifested to the defendant, to the extent they would affect how a reasonable person in the defendant's position would perceive his or her freedom to leave;

(5) subjective views or beliefs that the defendant manifested to the police, to the extent the officer's response would affect how a reasonable person in the defendant's position would perceive his or her freedom to leave;

(6) the focus of the investigation, as a reasonable person in the defendant's position would perceive it;

(7) whether the suspect was questioned in familiar surroundings;

(8) the number of law enforcement officers present;

(9) the degree of physical restraint placed upon the suspect; and

(10) the duration and character of the interrogation.

Viewing the factors objectively and in their totality, the court concludes that the Defendant was not subjected to custodial interrogation within the meaning of *Miranda v. Arizona* at any time on June 5, 2018. The factors identified by the Law Court are not simply a checklist. Rather, they assist the trial court in assessing the overall setting and circumstances of an interrogation/interview to determine whether it is custodial in nature.

The interview took place in a police cruiser outside of the Defendant's residence. Nothing was ever said to Perkins that the police had probable cause to arrest him at that time. Indeed, Quintero repeatedly told Perkins that it was unclear

11

and undetermined as to where the matter might lead or what the next step would be. Importantly, Quintero reminded Perkins on numerous occasions that he was free to get out of the cruiser and leave and Perkins acknowledged that he knew how to open the door if he wanted to. Perkins himself never suggested to the officers that he thought he was not free to leave. There can be little question that Perkins was the "focus" of the investigation and a reasonable person in his position would certainly perceive that to be the case. As noted above, the questioning took place in a police cruiser outside the Defendant's home. Two police officers were present for the interview, although Quintero did virtually all of the questioning. No physical restraint was place upon Perkins. Finally, the interview lasted approximately 2 ½ hours. Detectives Quintero and Ferland were respectful, professional and courteous at all times. Quintero was persistent in his approach during the interview, always returning to his theme that he (Quintero) knew when Perkins was lying and that Perkins needed to tell the complete truth. While Quintero was accusatory in the sense that he challenged Perkins whenever he believed Perkins was lying, his tone and demeanor was never angry or threatening, and he remained calm and patient.

Viewed in totality, and objectively, the court finds by a preponderance of the evidence that a reasonable person in the Defendant's position would have understood and believed that he was not in a custodial situation and that he was free to terminate the interview and leave.

### B. Were the Defendant's Statements on June 5, 2018 Voluntary?

In *State v. Hunt*, 2016 ME 172, ¶ 19, 151 A.3d 911, the Law Court clarified the "distinction between those statements that must be excluded pursuant to the Fifth Amendment because they are the product of compulsion, and those statements that must be excluded because their admission would otherwise create an injustice." The latter situation employs a due process analysis and seeks to address the question of whether a defendant's "statements were free and voluntary or whether, considering

the totality of the circumstances under which the statements were made, their admission would be fundamentally unfair." *Id.* The Court reaffirmed its holding in *State v. Mikulewicz*, 462 A.2d 497, 500-01 (Me. 1983) that "[a] confession is voluntary if it results from the free choice of a rational mind, if it is not a product of coercive police conduct, and if under all of the circumstances its admission would be fundamentally fair." A number of relevant factors may be considered by the court in making the voluntariness assessment, including:

> the details of the interrogation; duration of the interrogation; location of the interrogation; whether the interrogation was custodial; the recitation of *Miranda* warnings; the number of officers involved; the persistence of the officers; police trickery; threats, promises or inducements made to the defendant; and the defendant's age, physical and mental health, emotional stability, and conduct.

*State v. George*, 2012 ME 64, ¶ 21, 52 A.3d 903.

It is the State's burden to demonstrate that a statement is voluntary beyond a reasonable doubt. *State v. Annis*, 2018 ME 15, ¶ 13, 178 A.3d 467. *State v. Collins*, 297 A.2d 620, 626-27 (Me. 1972).

The Defendant has argued that Det. Quintero made improper promises to him as an inducement to get him to talk. Specifically, Perkins maintains that Quintero essentially promised that the prosecution of the case could potentially be avoided if Perkins told Quintero the truth about his actions with the minor children.

This case is more like *State v. McNaughton*, 2017 ME 173, ¶¶ 36-37, 168 A.3d 807, than those cases where a law enforcement officer made specific promises of leniency that "jeopardized the voluntary nature of a defendant's statements." *Compare State v. Wiley*, 2013 ME 30, ¶ 21, 61 A.3d 750; *State v. Tardiff*, 374 A.2d 598, 600-01 (Me. 1977). Quintero's statements were not specific and concrete promises of leniency. Rather, they were generalized exhortations to tell the truth. Moreover, Quintero accurately told Perkins that it was unknow what would happen

13

to the case, as the detectives had more work to do. Quintero, in essence, was urging Perkins to tell the truth so that his full version of what happened would be part of the continuing investigation. Quintero was not offering Perkins a chance to avoid prosecution if he confessed. On the contrary, he was attempting to persuade Perkins to "head this off at the pass" by telling his truthful and complete explanation up front at the early stages of the investigation.

Having listened to the recorded interview, the court is satisfied beyond a reasonable doubt: that the Defendant spoke with the officers as a result of his own free choice and rational mind; that the police did not engage in any deception or trickery or other coercive conduct, and; that admission of the Defendant's statements would not be fundamentally unfair.

Finally, with respect to the June 5, 2018 interview, the court is satisfied by a preponderance of the evidence that the Defendant's consent for the seizure of his personal computer was voluntarily and knowingly given. Det. Quintero repeatedly told Perkins that whether he agreed to surrender the computer to the police at that time was totally his choice and that he was under no obligation to do so. *Exhibit 1 at 95, 96, 97, 99, 100.* Perkins and Quintero discussed how quickly the computer would be returned to the Defendant, but ultimately, Perkins voluntarily agreed to let the police take the computer without a warrant. *Exhibit 1 at 102.*

C. **Was the Defendant Subjected to Custodial Interrogation on November 29, 2018?**

Utilizing the factors discussed earlier in this Order, the court finds by a preponderance of the evidence that the Defendant was not subjected to custodial interrogation on November 29, 2018 until he was placed under arrest by Det. Ferland. *Exhibit 2 at 115.* Applying the factors objectively and in their totality, the court finds that Det. Quintero told Perkins twice that he was not under arrest. Similarly, on two separate occasions he told Perkins that he was free to get out of

14

the cruiser if he wanted to. He told him at least twice that he would just as soon have Perkins get out of the car rather than lie.

It seems clear that it was the intention of law enforcement to arrest Perkins that day after the interview with him was completed. The analysis, however, is an objective one. While Quintero may have subjectively intended and knew that Perkins would be arrested later that day, the detective did not manifest that intention in any way to Perkins.

**D. <u>Assuming Perkins was Subjected to Custodial Interrogation on November 29, 2018, Did He Voluntarily Waive his *Miranda* Rights?</u>**

In the event the court is mistaken on the issue of custodial interrogation on November 29, 2018 as discussed above, the question arises as to whether Perkins was provided with *Miranda* warnings and, if so, whether he validly waived those rights and agreed to speak with the detectives on that occasion. Det. Quintero did, in fact, recite the *Miranda* warnings to Perkins on November 29, 2018. When he started to give those warnings at the beginning of the interview, however, Perkins interjected: "I know all of them." To each warning, Perkins responded: "Uh-huh," indicating his understanding of each right. Quintero did not obtain an explicit waiver from Perkins, but he did confirm Perkins's understanding that the interview was "voluntary." Perkins then proceeded to participate in the interview and answered questions posed by Quintero.

"The State bears the burden of establishing a knowing, intelligent, and voluntary waiver of *Miranda* rights by a preponderance of the evidence." *State v. Lockhart*, 2003 ME 108, ¶21, 830 A.2d 433 *quoting State v. Coombs*, 1998 ME 1, ¶ 15, 704 A.2d 392. *See also State v. Ormsby*, 2013 ME 88, ¶ 27, 81 A.3d 336, *cert. denied,* 134 S. Ct. 1523. A person's waiver of *Miranda* need not be explicit but the person's conduct "must demonstrate an intentional relinquishment or abandonment of known rights." *Lockhart*, 2003 ME 108, ¶ 21.

By his words and actions, Perkins manifested his intention to waive his *Miranda* rights and speak voluntarily with Quintero. He clearly expressed his understanding of his rights and demonstrated his willingness to relinquish those rights by speaking to the detective. The court is satisfied by a preponderance of the evidence that Perkins voluntarily, knowingly, and intentionally waived his *Miranda* rights.

As found above, Perkins was clearly subjected to custodial interrogation when he was informed by Det. Ferland that he was under arrest at about the second hour of the interview. *Exhibit 2 at 115.* Following that, Det. Quintero re-read the *Miranda* warnings/rights to Perkins, who again indicated that he understood them. *Exhibit 2 at 119-20.* Once again, however, Det. Quintero did not obtain an explicit waiver from Perkins. Nevertheless, after having been read the *Miranda* warnings a second time and after expressing his understanding of those rights, it was Perkins himself who began talking by asking the detectives what had been told to his wife. *Id.* Perkins and the detectives continued to talk with each other until they arrived at the jail. The court is satisfied by a preponderance of the evidence that Perkins knowingly, intentionally and voluntarily waived his right to remain silent and agreed to speak with law enforcement.

### E. Did Perkins Invoke his Right to Counsel or His Right to Cut Off Questioning?

When Det. Quintero told Perkins on November 29, 2018 that the allegation concerning the teenage boy involved a claim that Perkins had performed oral sex on the boy, Perkins adamantly denied that ever happening and said: "No, no. I don't care – no, no. I will contact a lawyer. I have never even seen that kid's dick, never, never." *See Exhibit 2 at 18.* Perkins continued to talk to Quintero, who ultimately told Perkins to "calm down." The question arises as to whether the statement by Perkins, "I will contact a lawyer," constituted an invocation of his right to counsel,

assuming the November 29, 2018 interview was "custodial interrogation" at that point in time. If Perkins was subject to custodial interrogation and if his reference to a lawyer amounted to an invocation of counsel, all questioning should have ceased.

Both the United States Supreme Court and the Maine Law Court have held: "If an accused makes a statement concerning the right to counsel 'that is ambiguous or equivocal' or makes no statement, the police are not required to end the interrogation . . . or ask questions to clarify whether the accused wants to invoke his or her *Miranda* rights." *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010). *See also State v. McNaughton*, 2017 ME 173, ¶ 29. In other words, a suspect must invoke his right to counsel (or the right to cut off questioning) "unambiguously." *Id.*

Here, Perkins' comment that he "will contact a lawyer" was not an unambiguous invocation of his right to counsel. Based on listening to the recording itself, the court is satisfied that Perkins was not, in fact, unambiguously invoking his right to counsel. Rather, he was expressing his view to Det. Quintero that he so strongly disagreed with Quintero's claim that he had performed oral sex on the teenage boy that he would fight that allegation going forward. Perkins continued to talk with Quintero and continued to answer his questions.

Similarly, Perkins did not unambiguously invoke his right to cut off questioning when, on two occasions, he said he was going to get out of the cruiser and leave. *Exhibit 2 at 50, 56.* On both occasions, Det. Quintero told Perkins that he could leave if he wanted to. Perkins did not leave and there is no indication from the recordings that he made any effort to leave the cruiser and cut off questioning. Rather, he stayed in the car and continued to talk with the detective.

Finally, the court has considered whether the statements made by Perkins in the November 29, 2018 interview were voluntary. Having listened to the recorded interview, the court is satisfied beyond a reasonable doubt: that the Defendant spoke

17

with the officers as a result of his own free choice and rational mind; that the police did not engage in any deception or trickery or other coercive conduct, and; that admission of the Defendant's statements made on November 29, 2018 would not be fundamentally unfair.

## CONCLUSION

The entry is: Defendant's Motion to Suppress is DENIED.

Dated: September 19, 2019

William R. Stokes
Justice, Superior Court

Entered on the docket 9/20/19